CHESAPEAKE CORPORATION and Sheffield, Inc., Plaintiffs,

v.

Marc P. SHORE, Howard M. Liebman Andrew N. Shore, Leonard J. Verabay, Virginia A. Kamsky, Sharon R. Fairley, R. Timothy O'Donnell, Kevin J. Bannon William P. Weidner, and Shorewood Packaging Corporation, Defendants.

Civ. A. No. 17626.

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 28, 2000.
Decided: Feb. 7, 2000.
Corrected: Feb. 11, 2000.

Jesse A. Finkelstein, C. Malcolm Cochran, IV, Anne C. Foster, Lisa A. Schmidt, J. Travis Laster, Srinivas M. Raju, Michael D. Allen, of Richards, Layton & Finger, Wilmington, of Counsel: James E. Farnham, Edward J. Fuhr, Stacy Colvin Taylor, of Hunton & Williams, Richmond, Virginia, for Plaintiffs.

Edward P. Welch, Robert S. Saunders, Martina Bernstein, Julie A. Tostrup, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Defendants.

OPINION

STRINE, Vice Chancellor.

This case involves a contest for control between two corporations in the specialty packaging industry, the plaintiff Chesapeake Corporation and the defendant Shorewood Packaging Corporation, whose boards of directors both believe that the companies should be merged. The boards just disagree on which company should acquire the other and who should manage the resulting entity.

Shorewood started the dance by making a 41%, all-cash, all-shares premium offer for Chesapeake. The Chesapeake board rejected the offer as inadequate, citing the fact that the stock market was undervaluing its shares. Chesapeake countered with a 40%, all-cash, all-shares premium offer for Shorewood. The Shorewood board, all of whose members are defendants in this case, turned down this offer, claiming that the market was also undervaluing Shorewood.

Recognizing that Chesapeake, a takeover-proof Virginia corporation, might pursue Shorewood, a Delaware corporation, through a contested tender offer or proxy fight, the Shorewood board adopted a host of defensive bylaws to supplement Shorewood's poison pill. The bylaws were designed to make it more difficult for Chesapeake to amend the Shorewood bylaws to eliminate its classified board structure, unseat the director-defendants, and install a new board amenable to its offer. These bylaws, among other things, eliminated the ability of stockholders to call special meetings and gave the Shorewood board con-

trol over the record date for any consent solicitation.

Most important, the bylaws raised the votes required to amend the bylaws from a simple majority to 66 2/3% of the outstanding shares. Because Shorewood's management controls nearly 24% of the company's stock, the 66 2/3% Supermajority Bylaw made it mathematically impossible for Chesapeake to prevail in a consent solicitation without management's support, assuming a 90% turnout.

Chesapeake then increased its offer, went public with it in the form of a tender offer and a consent solicitation, and initiated this lawsuit challenging the 66 2/3% Supermajority Bylaw. Shortly before trial, the Shorewood board amended the Bylaw to reduce the required vote to 60%.

Chesapeake challenges the 60% Supermajority Bylaw's validity on several grounds. Principally, Chesapeake contends that the Shorewood board, which is dominated by inside directors, adopted the Bylaw so as to entrench itself and without informed deliberations. It argues that the Bylaw raises the required vote to unattainable levels and is grossly disproportionate to the modest threat posed by Chesapeake's fully negotiable premium offer. Moreover, it claims that the defendants' argument that the Bylaw is necessary to protect Shorewood's sophisticated stockholder base, which is comprised predominately of institutional investors and management holders, from the risk of confusion is wholly pretextual and factually unsubstantiated.

In this post-trial opinion, I conclude that the defendants have not met their burden to sustain the Supermajority Bylaw under either the *Unocal v. Mesa Petroleum Co.*[1] or *Blasius Indus. v. Atlas Corp.*[2] stan-

dards of review. Among the reasons that support this conclusion are:

- the defendants faced only a modest threat of price inadequacy, which was adequately addressed by other defensive measures and less draconian options available to the Shorewood board;
- there was no legitimate threat of stockholder confusion to which the Supermajority Bylaw was responsive;
- the defendants failed to consider whether any insurgent could realistically satisfy the Supermajority Bylaw in the face of management opposition, as well as several other material issues;
- there is no real-world evidence that a 60% vote is attainable by an insurgent opposed by Shorewood management;
- the defendants improperly treated themselves as "disinterested stockholders" while treating other similarly situated stockholders as "interested" and as therefore having less right to influence company policy at the ballot box;
- the defendants' deliberative processes were grossly inadequate; and
- the defendants acted with the primary intent of changing the electoral rules so as to make it more difficult to unseat them.

In sum, the Supermajority Bylaw is a preclusive, unjustified impairment of the Shorewood stockholders' right to influence their company's policies through the ballot box.

In this opinion, I also address the defendants' claim that the Shorewood stockholders are prohibited from voting to eliminate the company's classified board structure and subsequently seating a new board. I

---

**1.** Del.Supr., 493 A.2d 946 (1985).

**2.** Del.Ch., 564 A.2d 651 (1988).

reject that claim as inconsistent with the plain language of 8 *Del. C.* § 141 and the policy of our corporation law that stockholders have the authority to determine the governance structure of their corporations in the bylaws, absent a certificate provision to the contrary.

Finally, I also reject the defendants' argument that Chesapeake is an interested stockholder under 8 *Del. C.* § 203 and therefore cannot consummate a merger with Shorewood for three years.

## I. *The Parties*

### A. *The Plaintiffs*

Plaintiff Chesapeake is a Virginia corporation. Plaintiff Sheffield, Inc. is Chesapeake's wholly-owned acquisition vehicle for its hoped-for purchase of Shorewood. Sheffield is a Delaware corporation.

### B. *The Defendants*

Defendant Shorewood is a Delaware corporation. The other defendants are all members of the nine-member Shorewood board of directors.

#### 1. *The Non–Outside And/Or Non–Independent Shorewood Director–Defendants*

Defendant Marc P. Shore is Shorewood's Chairman and Chief Executive Officer. He is one of the children of Paul B. Shore, founder of the company. Through personal holdings, family partnerships, and family trusts, Marc Shore owns or controls the vote of 17.38% of Shorewood's outstanding stock.

Marc Shore receives generous compensation from Shorewood. In 1999, for example, he received a base salary of $800,000, a bonus of nearly $ 1.1 million,

other compensation of nearly $150,000, restricted stock awards valued at $825,000, and an option on 350,000 Shorewood shares.[3] This compensation came in a year when Shorewood's own share price took a beating.

On November 10, 1999, the same day that Shorewood received Chesapeake's first acquisition offer, Shore entered into a five-year employment agreement with Shorewood, effective as of May 1998. The agreement provided for a $1 million signing bonus, an annual base salary of $800,000, and the potential for discretionary bonuses beyond Shorewood's bonus plan, under which Shore could already receive up to $2 million annually.

Shorewood has also provided Marc Shore with less traditional financial benefits. Apparently, Shore has had difficulty managing his personal finances and has racked up $10–11 million in debts that he has been unable to handle without additional help from Shorewood. Two million dollars of this debt is actually owed to Shorewood and is due in full in May 2000. In 1998 and 1999, the Shorewood board's compensation committee waived the mandatory pre-payments Shore owed on this debt.

In 1999, Marc Shore faced a personal liquidity crisis due to his inability to meet margin calls on the Shorewood shares pledged to support his· debt. To help him deal with this problem, in the spring through the fall of 1999, the Shorewood board authorized advancements to him of $2.6 million. Things got so bad by October of 1999 that the Shorewood board voted, without seeing an appraisal, to purchase a residential property owned by Marc Shore for $3.5 million. The level of

---

**3.** The stock option has the potential, under valuations required to be disclosed by the Securities and Exchange Commission, to be worth from $3 million to $7.7 million at the end of the ten-year option period.

the board's understanding about the need for and the basis of this transaction was, without going into detail, insufficient. So was its consideration of other alternatives.

Although some of Shore's fellow directors testified that they did not want Shore to have to sell company stock to meet his obligations because that would have hurt other stockholders, others candidly admitted that the board did not want Shore to have to sell his stock at a time disadvantageous to himself. Thus they were willing to buy his residence instead. Though this transaction was never ultimately consummated, it speaks volumes about the financial security Marc Shore derives from his managerial position at Shorewood and the board's loyalty to him.

■ Based on Marc Shore's managerial position, his compensation package, and the Shorewood board's demonstrated willingness to get Shore out of financial jams, he cannot be considered an outside, independent director.[4]

■ Defendant Howard M. Liebman is the President and Chief Financial Officer of Shorewood. He received salary, other compensation, a bonus and restricted stock awards in 1999 totaling over $1.2 million, as well as 150,000 stock options. Liebman has received loans from Shorewood and owes the company nearly $1.3 million. Also like Marc Shore, Liebman entered into a five-year employment contract last fall, effective May 1998. Given his managerial position and lucrative compensation and loan arrangements with Shorewood, Liebman cannot be considered an outside, independent director.

■ Defendant Andrew N. Shore is Marc Shore's brother. He has been Vice President and General Counsel of Shorewood since 1996, when he was hired by his brother. In that position, Andrew Shore appears to make well over $200,000 a year. Andrew Shore joined the Shorewood board in September 1999. In addition, Andrew Shore is owed a substantial sum of money by Marc Shore, and that debt is part of the reason Marc Shore needed help from Shorewood in 1999. Given his managerial position at Shorewood and his familial relationship with Marc Shore,[5] Andrew Shore cannot be considered an outside, independent director.

■ Defendant Leonard J. Verebay is an executive vice president of Shorewood. He receives a salary of $500,000 for which he works approximately 10 hours a week. Verebay joined the Shorewood board in February 1999 after Shorewood purchased Queens Group, Inc. Given his managerial position, Verebay cannot be considered an outside, independent director.

■ Defendant R. Timothy O'Donnell has had a long relationship with Shorewood, dating back to when he was the leader of a PaineWebber team that helped take Shorewood public. Since 1989,

---

4. I use the definitions set forth in *Unitrin, Inc. v. American Gen'l Corp.*, Del.Supr., 651 A.2d 1361 (1995). *Unitrin* defined an "outside director" as a "non-employee and non-management director." *Id.* at 1375. *Unitrin* defines an independent director as one who can base her judgments on the corporate merits without being influenced by extraneous influences, such as personal relationships the director has with management or a controlling stockholder, or other material financial relationships the director has with the corporation.

See also *Rales v. Blasband*, Del.Supr., 634 A.2d 927 (1993) (fleshing out the independence concept).

5. *Grimes v. Donald*, Del.Supr., 673 A.2d 1207, 1216 (1996) (a material "familial interest" can render a director non-independent); *Harbor Finance Partners v. Huizenga*, Del.Ch., 751 A.2d 879, 889–90 (1999) (same); *Mizel v. Connelly*, Del.Ch., C.A. No. 16638, mem. op. at 9–11, Strine, V.C. (Aug. 2, 1999) (same).

O'Donnell has been president and principal stockholder of Jefferson Capital Group, Ltd., an investment banking firm. Over the years, Jefferson Capital has received millions of dollars in fees for work for Shorewood. It has also been retained by Shorewood in connection with its current tangle with Chesapeake and is currently consulting with Shorewood on other projects. O'Donnell admits that he cannot be classified as a "disinterested director" in light of Jefferson Capital's substantial work for Shorewood. Moreover, O'Donnell is a close personal friend of Marc Shore. O'Donnell is the leading member of the board's compensation committee and has spearheaded the board's efforts to help Marc Shore with his financial problems. He cannot be considered an independent director.

■ Defendant Virginia A. Kamsky is the founder, CEO, and principal stockholder of Kamsky Associates, Inc., a business consulting firm specializing in advice to companies that want to do business in the People's Republic Of China.[6] Kamsky joined the Shorewood board on June 8, 1999. For the past three years, Kamsky has been advising Shorewood regarding its investment in a manufacturing facility in China. Her firm receives a $25,000 monthly retainer from Shorewood, plus 5% of the net profits from the operations or sale of the China facility. At the time she joined the board, the board was informed by management that Kamsky's contractual arrangements with Shorewood rendered her ineligible to serve on the board's compensation or audit committees. Given her firm's substantial financial interests in Shorewood's business, Kamsky cannot be considered an independent director.

### 2. The Other Director–Defendants

■ Defendant Kevin J. Bannon heads the investment management group at Bank of New York. Bannon joined the Shorewood board in 1992 at the request of Paul Shore, who was at that time Bannon's client. The Bank Of New York has loaned Shorewood $25 million as part of a lending syndicate and acts as Shorewood's transfer agent. Moreover, Bannon executed a written consent ratifying the original Supermajority Bylaw challenged in this case, even though he did not participate in the board meeting at which these were discussed. Despite these facts, I cannot conclude that Bannon is not an independent director. There has been no showing that the work Bank of New York has done for Shorewood is material to it, and that work appears to be done by departments in that Bank unrelated to Bannon's employment there. Furthermore, although Bannon's decision to execute the consent is questionable, he did participate in other meetings, and without more evidence, a credible finding of lack of independence cannot be made.

Defendant Sharon R. Fairley is a top marketing executive at a major pharmaceutical company. She joined the Shorewood board on September 2, 1999. There is no credible evidence that Fairley's independence is compromised.

Defendant William P. Weidner is President and CEO of Las Vegas Sands, Inc., a hotel and casino developer in Las Vegas, Nevada. No challenge to Weidner's independence has been made.

### II. The Defendants' Unusual Presentation Of Their Case And Reliance On Evidentiary Privileges

Before discussing the facts, it is important for the reader to understand two factors that have limited my ability to deter-

---

**6.** A name which, sadly, still mocks the reality of life in that nation.

mine the course of events as precisely as I would have liked.

First, the defendants chose not to have any of the key insiders at Shorewood testify at trial. In particular, the company's CEO Marc Shore did not testify on the defendants' behalf.

■ In lieu of such testimony, the defendants relied on the testimony of directors Kamsky and Fairley. As of the time of trial, Kamsky and Fairley had less than a year's worth of Shorewood board experience between them. Although both Kamsky and Fairley are intelligent and accomplished in their fields, they obviously lacked the depth of experience with and hands-on responsibility at Shorewood possessed by directors like Marc Shore and Howard Liebman. In essence, I never got to hear the "Shorewood board's story" from its leader, Marc Shore, or one of its top managers.[7]

Second, the Shorewood board has invoked the business strategy and attorney-client privileges whenever it could do so. As a result, virtually all of the professional advice given to the Shorewood board has been kept from Chesapeake and its counsel—and thus the court.

During the litigation, the defendants have attempted to use some of this concealed advice as a sword. For example, the defendants have attempted to establish that they have hired reputable investment bankers to look at strategic alternatives. Yet the defendants refused to allow Chesapeake to inquire even as to the basic nature of those alternatives. They stood by this position throughout the trial.

As a result, the only fair way to proceed is not to give any weight to any advice of this nature or to the defendants' supposed search for alternatives. The potential for abuse is simply too great. For example, the defendants could be looking only at strategic alternatives that involve the continuation in office of Shorewood's management. Having denied Chesapeake and the court any opportunity to determine whether this is so, the defendants cannot use their hiring of advisors as evidence that they are willing to sell Shorewood at the right price to a party who intends to replace the Shorewood board and management. To allow the defendants to do so would be inequitable.[8]

7. "[T]he production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse." *Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638 A.2d 1110, 1119 n. 7 (1994); *see also Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 879 (1985).

8. As Vice Chancellor Jacobs well put it:
   By blocking discovery into these subjects, the defendants have, as a legal and evidentiary matter, thereby precluded themselves from arguing or placing into evidence the content of the legal advice they received or of the collective deliberations *into which* discovery was blocked. It must be emphasized that under *Unocal* and *Unitrin* the defendants have the burden of showing the reasonableness of their investigation, the reasonableness of their process and also of the result that they reached. One would think that a board having that burden would want to expose their deliberative process to full view, but they are not legally required to do so.
   The defendants are the masters of the evidence they will present in their defense, but they must accept the consequences of their tactical choice. Here the defendants' tactical decision to bar on privileg[e] grounds discovery into what the board was advised was their fiduciary duty and into the content of the board's deliberations will in turn preclude them from proving those deliberations at trial to defend their position that their decision was reasonable and made with due care.
   *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, Del.Ch., C.A. No. 16584, tr. at 505, Jacobs, V.C. (Oct. 23, 1998).

With this background in mind, I turn to the facts leading to this dispute.

## III. Findings of Fact

### A. Shorewood And Chesapeake Each Identify The Other As An Acquisition Candidate

As of early 1999, the logic of combining Shorewood's and Chesapeake's assets into one company appealed to the management of both companies. Under a new management team, Chesapeake had been divesting itself of capital-intensive, commodity businesses so that it could concentrate on being a provider of high-end specialty packaging and merchandising services. The money it obtained through divestiture was being used to purchase businesses that would fit Chesapeake's new strategy. In 1998, Chesapeake identified Shorewood as a desirable acquisition target.

For its part, Shorewood is a provider of high quality printing and paperboard packaging for the computer software, cosmetics, food, home video, music, tobacco and general consumer markets in North America and China. Beginning in February 1999, Shorewood began purchasing Chesapeake stock, supposedly for "investment purposes only" because Shorewood believed that Chesapeake's value was not recognized in the market. But on March 2, 1999, Shorewood's CEO Marc Shore received a memorandum from his fellow director and key financial advisor Tim O'Donnell outlining the logic and possible financial benefits of a strategy whereby Shorewood and a paper company would buy Chesapeake and divvy up its assets.

On June 4 and August 17, 1999, Marc Shore and Chesapeake CEO Thomas H. Johnson met in New York City. Shore instigated this set of meetings. According to Johnson, who testified about the meetings, Shore was quite vague in his overtures, but seemed to want to engage in some sort of joint venture. During the meetings, Shore assured Johnson that Shorewood (which by July owned 4.6% of Chesapeake's shares) had purchased stock in Chesapeake as an investment only. This was, of course, not strictly true since Shore and O'Donnell had been having "general conversations" about whether Shorewood would actually try to buy Chesapeake.[9]

But then again, Johnson was hardly effusive about his own intentions. Apparently, he never told Shore that Chesapeake had been analyzing an acquisition of Shorewood since 1998.

The two meetings went nowhere. The two acquisition-hungry CEOs retired to their headquarters to plot their next moves.

### B. Shorewood Strikes First

Seizing upon a sharp decline in the market price of Chesapeake's stock, Marc Shore and O'Donnell came up with a plan to acquire Chesapeake for $40 a share, a 41% premium to the then prevailing market price—which Shorewood admits was depressed.[10] At an October 26, 1999 Shorewood board meeting, Shore obtained the board's support for this plan. The board's deliberations were not extensive, and they received no written analysis of the proposed acquisition.

The same day Marc Shore called Chesapeake's CEO Johnson and told him that a letter containing an acquisition proposal would be forthcoming. Johnson told him that Chesapeake was not for sale but that Chesapeake would consider whatever pro-

---

9. M. Shore Dep. at 75–76.

10. The $40 offer constituted only a slight premium over Chesapeake's high trading price of $38.56 for the six months preceding the offer.

posal Shorewood made. After Johnson received Shore's letter containing the precise terms of the offer, Johnson again informed Shore that Chesapeake was not for sale, but that its board would analyze the offer and respond to Shore no later than November 5, 1999.

By that time, Johnson had already reached a personal conclusion that the offer was a not a fair price for Chesapeake. According to his testimony, however, he had an open mind and wanted to hear from his fellow directors and professional financial advisors. On November 3, 1999, the Chesapeake board met for that purpose. Thereafter, the Chesapeake board unanimously voted that the Shorewood offer was inadequate and authorized Johnson to communicate that position to Shorewood. The Chesapeake board did not consider whether to negotiate with Shorewood to obtain a higher bid.

### C. *Chesapeake Responds In Kind With A Bid To Acquire Shorewood*

Johnson then called Shore to set up a meeting for November 10, 1999. Johnson could do so with rather absolute confidence that he could block a hostile acquisition of Chesapeake by Shorewood. As a Virginia corporation, Chesapeake is authorized to—and does—have in place iron-clad defenses, including a so-called "dead-hand poison pill" and a staggered board. The Chesa-

peake board never considered lowering these defenses to allow Shorewood to take its offer to the Chesapeake shareholders. Thus its decision effectively precluded Shorewood from presenting its offer to them.[11]

At the November 10, 1999 meeting, Johnson told Shore that Chesapeake had rejected the Shorewood offer, but was interested in a transaction whereby Chesapeake would purchase all of Shorewood for $16.50 a share. This price constituted a 40% premium over the current trading levels of Shorewood, but was below Shorewood's trailing 12–month closing high of $20.63 per share.[12] Johnson gave Shore a letter in which he stressed that Chesapeake could finance such a transaction without difficulty and that Chesapeake was prepared to negotiate with Shorewood. At the same meeting, Johnson explained that the strength of Chesapeake's antitakeover defenses made it virtually impossible for Shorewood to acquire Chesapeake without its board's support.

Shore told Johnson that the Shorewood board would consider the $16.50 offer, but made clear his own view that the offer was inadequate and the likelihood that his board would reach the same conclusion. As Shore apparently put it, "if Shorewood's 41% premium wasn't good enough for Chesapeake's shareholders, why should

11. For whatever modest comfort it is worth to the defendants, I concede that the core reason the Chesapeake board gave for not allowing its stockholders to entertain the Shorewood bid—the Chesapeake stockholders might mistakenly find it attractive—is identical to that the defendants use to justify their actions. That it therefore is a bit graceless for Chesapeake to make its arguments, however, does not relieve me of my responsibility to consider them.

12. The $16.50 a share offer also lagged Shorewood's average trading price for the preceding twelve months of $17.08. Shore-

wood points out that the offer was significantly less than certain valuations done by Chesapeake's investment bankers. But there is no evidence that these valuations were considered by the Shorewood board. Moreover, the valuations appear to include synergies from the combination. I will also obviously decide this case on the assumption that Chesapeake is attempting to acquire Shorewood at a favorable price. In any sales transaction, the acquiror must think it is getting something worth more to it than the cash it is paying; otherwise, why would it do the deal?

Chesapeake's 40% premium be good enough for Shorewood's?"

## D. *The Shorewood Board Rejects Chesapeake's Offer As Inadequate*

On November 16, 1999, the Shorewood board convened by telephone to consider the $16.50 per share offer. At the meeting, the board received no written materials and no advice from any outside financial advisor, although it did receive advice from the law firm of Bryan Cave, LLP. Shorewood has blocked any inquiry into the nature of the legal advice given to its board and therefore the director-defendants cannot rely upon that advice to support their position in this litigation.

The bulk of the meeting was dominated by a discussion of the background and adequacy of the offer by Marc Shore and O'Donnell. They emphasized that the offer, while a premium to Shorewood's current market price, was low compared to the Shorewood's historical prices and the prices at which other specialty packaging companies had been purchased.[13] The favorable prospects for earnings under Shorewood's existing strategy were also stressed. O'Donnell opined that the $16.50 offer represented "a substantial discount to the Company's true value based on both its historical multiples and market multiples."[14]

The board concluded that it did not need any additional financial advice to determine whether the Chesapeake offer was inadequate. It appears that the issue of inadequacy was not even a close question for most of the directors, many of whom found the offer so low as to indicate either a lack of good faith or seriousness on Chesapeake's part. No one on the board thought the offer was inviting enough to serve as the basis for further discussions with Chesapeake; indeed, this option was not even discussed.

Moreover, several members of the board viewed O'Donnell as a relevant source of expertise, given the regular financial advisory services he provided to Shorewood. O'Donnell did not view himself as giving a "fairness opinion," something Jefferson Capital has never done, a fact unknown to at least some members of the board. Nor had O'Donnell yet been retained as a financial advisor regarding the Chesapeake situation. Given how regularly he did financial advisory services for the company, it is clear, however, that both he and the board thought he was speaking both as a financial advisor to the company and as a director.

Although the board viewed the Chesapeake offer as grossly inadequate, the board felt it could not react supinely to the Chesapeake offer given the depressed level at which Shorewood's stock was trading. The board therefore chewed on several options, including stepping up Shorewood's own efforts to acquire Chesapeake, dropping the matter and hoping that Chesapeake would do the same, and publicizing the as-yet non-public Shorewood offer for Chesapeake.

According to the November 16 meeting minutes, the board resolved to make public the interplay between Shorewood and Chesapeake. Most significantly for present purposes, the board appears to have asked outside counsel to review the company's defenses and recommend any mea-

---

**13.** This comparison involved measuring the offer price times the acquired company's earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a method Chesapeake's CEO Johnson agrees is relevant.

**14.** PX 52.

sures necessary to strengthen them in the face of Chesapeake's bid. No substantive discussion of such measures occurred at the November 16 meeting.

### E. *The Shorewood Board Meets By Phone To Adopt A Package Of Defensive Measures*

On November 18, 1999, the Shorewood board met telephonically for thirty minutes to consider a package of defensive bylaw changes. Directors Verebay and Bannon did not attend. The only outside advisors present were lawyers from Bryan Cave, whose advice has been withheld on grounds of attorney-client privilege.[15] The text of the bylaw changes being proposed was not provided to the board.

Marc Shore opened the meeting by explaining that the meeting's purpose was "to consider certain amendments to the Corporation's Bylaws that might better enable the Board to defend the Company against a hostile takeover attempt which might not be in the best interests of the Corporation's stockholders."[16] He then expressed the view that the Chesapeake's most recent letter "could only be understood as a threat of an [sic] hostile tender offer and proxy fight and that he understood that the Corporation's ability to defend against threats to its stockholders' interests, such as Chesapeake's grossly inadequate offer of $16.50 per share, were weaker than they needed to be."[17]

Marc Shore and the other insiders were primarily concerned about bylaw amendments to eliminate the company's classified board structure, which would open the way to the removal of the sitting board and the installation of a new board. The package of amendments (the "Defensive Bylaws") included the following measures designed to make that possibility less likely:

- the elimination of the right of stockholders to call special meetings;

- the elimination of the ability of stockholders to remove directors without cause;

- the adoption of procedures regulating the consent solicitation process, which gave the board significant leeway to determine a record date;

- the elimination of the stockholders' ability to fill board vacancies; and

- the imposition of a supermajority voting requirement for stockholder-initiated bylaw changes (the "Supermajority Bylaw").

Each proposal was considered individually. There is no evidence that the directors considered their cumulative impact.

The board's deliberations regarding the Supermajority Bylaw appear to have been quite truncated and perfunctory. Presented with a choice between an 80% Supermajority Bylaw and a 66 2/3% Supermajority Bylaw, the board chose the latter option as less extreme.

Yet the information the board used to determine whether to adopt any supermajority bylaw at all appears to have been grossly inadequate. The board appears to have failed to even discuss, among other things, much less give adequate consideration to the following factors:

- the likely voter turnout in the event of a consent solicitation;

---

**15.** The board apparently received a very short electronic mail from Bryan Cave regarding the proposed changes shortly before the meeting. That document has not been produced in the litigation and I therefore give it no weight.

**16.** PX 53.

**17.** *Id.*

- the composition of the Shorewood electorate, including the proportion of Shorewood shares held by institutional investors and by Shorewood insiders;
- whether it was reasonable to expect that anyone could obtain 66 2/3% of the outstanding shares in a consent solicitation without the support of the Shore family shares and the other shares controlled by Shorewood insiders; and
- whether the Shorewood board faced a realistic prospect of losing a consent solicitation battle with Chesapeake without a supermajority bylaw.

A simple mathematics exercise is the best way to illustrate the deficiencies in the board's process. At the time of the November 18, 1999 meeting, Shorewood management insiders had the ability to control nearly 24% of Shorewood's outstanding shares.[18] Assuming a 90% turnout and the opposition of these managers to seeing themselves turned out of the board room, it was mathematically impossible for an insurgent to prevail in a consent solicitation under the 66 2/3% Supermajority Bylaw. Quite obviously, the 80% option was the ultimate defense, because it gave the Shorewood board a guarantee of victory with a turnout of 100%.

Furthermore, the reality was that historical voting turnout at Shorewood elections had been in the 75–80% range and that shares held by institutional investors comprised the great majority of those left after subtracting insider holdings. Marc Shore and the other management members of the board possessed this information but did not present it to the board in any way that related those facts to the propriety of adopting the Supermajority Bylaw. Several of the directors appear to have been ignorant of these facts.

Nor did the board consider whether the perquisites of their positions might lead the management-stockholders to vote differently than stockholders without any other financial relationship with Shorewood. At least one of the outside directors, Ms. Fairley, did not see this information as relevant.

### F. The "Threats" Identified At The November 16 and 18 Shorewood Board Meetings

In this case, the defendants have relied for the most part on two related threats posed by Chesapeake's $16.50 offer. First, the defendants claim that the $16.50 offer was grossly inadequate and thus Shorewood stockholders faced great harm if they sold their stock at that price. Second, the defendants assert that there was a danger that Shorewood stockholders would be confused about the intrinsic value of the company, fail to understand management's explanation as to why the market was undervaluing their stock, and mistakenly tender consents to Chesapeake to facilitate its unfair offer.

While there is strong evidence that the board focused on price inadequacy as a key threat at the November board meet-

---

18. I will use this figure, or 23.88% to be more exact, throughout this opinion for several reasons. First, this figure is drawn from Shorewood's own 14D–9 and accurately reflects the voting power the insiders may exercise in a consent solicitation. Because the defendants control the record date and can exercise this voting power, it is fair to attribute it to them. Second, Shorewood provides all of its employees with options and thus the holdings of Shorewood employees are likely to be fairly substantial, and these shares will undoubtedly vote with current management. Third, Shorewood has a regular repurchase program in place that can be used to increase management's proportionate holdings. The defendants have blocked any inquiry into how that program may be being used now.

ings, the minutes and contemporaneous notes of those board meetings are devoid of the mention of the latter threat. This is quite curious, given the enormous importance the defendants place on this threat in the litigation.

According to the defendants' deposition and trial testimony, they were concerned as early as the November board meetings that the market would not understand: (1) the value of Shorewood's investment in a plant in China; (2) the efficiencies that Shorewood would achieve due to certain investments and plant closures; (3) the synergies associated with Shorewood's acquisition of Queens Group and two smaller companies; and (4) Shorewood's attempt to position itself to take advantage of an international trend towards use of a smaller group of packaging suppliers by manufacturers.

As a matter of chronology, I believe that the "confusion" threat was not identified until December. The absence of a discussion of these issues in the minutes or the contemporaneous notes is one critical reason I believe this to be so. The other is the fact that some of the record evidence on this point had to be elicited through leading questioning of defendants by their own counsel at depositions, using a Shorewood 14D–9 that was not created until December.

In any event, regardless of when the confusion threat was identified, that threat hardly emerges as a particularly dangerous one. The defendants admit that the company had disclosed all material information regarding the business factors they felt the stockholders could not understand.

And in deposition and trial testimony, several of the defendants were able to describe these factors in lucid and understandable terms. For example, Kamsky testified as to the value of the China initiative, which involves a manufacturing plant in China owned by Shorewood in a 55%–45% joint venture with Westvaco, a leading industry player. Kamsky noted that Shorewood has a huge competitive advantage because it has been permitted to proceed without the usual Chinese requirement to have a state-owned joint venture partner, thus saving enormous operating expenses and bureaucratic red tape. Moreover, she pointed out that Shorewood's plant has obtained a rare exclusive license to conduct business in three key provinces strategically located near manufacturers who can use the plant's services. Not only that, the plant has been qualified to do work for the Malaysia facility of Phillip Morris, a Shorewood customer in other parts of the world. Given this positioning and the huge potential for growth in consumer demand in that part of the world, Kamsky expects the plant to generate substantial profits in the near future. In fact, Shorewood's prospects in China are so good it got Westvaco to pay $22.7 million for its 45% share of the plant, which represents a $5 million premium over Shorewood's cost of construction.

The directors of Shorewood not only can explain factors like these in understandable terms, but according to them, they do it with the analyst community on a regular basis. As Ms. Kamsky testified at her deposition:

I'll tell you, just along those lines, if you speak to the investment houses' analysts about the value of Shorewood's stock, they place the stock considerably higher than what we were faced with. Interestingly, it includes Goldman Sachs, who is advising Chesapeake.

I have listened in on the phone calls that Marc and Howard hold with the investment community where they call in and one thing that I find very refreshing about the Shorewood board and particularly about Marc and Howard is that, if

anything, they underplay the conservative. They don't overplay. They don't underplay earnings, but they are conservative and they don't go out to the Street and say, you know, we're the hundred pound gorilla and we should be at $40 a share.

But if you listen to the analysts when Marc is talking and Howard is talking, they will consistently come back and they will say, "This year you had extraordinary capital expenditures. You had China. You had Queens. You have money for acquisitions, technology. That's a one-time hit. So that means that next year you're not going to have that hit, which will translate into a $22 per share price."

Now, this is public record and these are well-informed analysts from the top institutions.[19]

Indeed, the factors identified by the Shorewood directors as not being adequately reflected in the company's market price are all discussed in industry analyst reports from respected investment banks like Lehman Brothers and Goldman Sachs. These reports set one-year price targets for Shorewood's stock which exceeded Chesapeake's $16.50 a share offer by as much as $7.50 a share.

Undermining the risk of confusion is Marc Shore's and Liebman's belief that Shorewood management has strong credibility with the investment community. In that regard, Shore testified at his deposition that Shorewood could have beaten off Chesapeake's $16.50 per share offer, because the company would have been able to convince its stockholders that Shorewood was worth more than that. For his part, director O'Donnell said that Shorewood can communicate anything to its stockholders, given enough time.

The most the Shorewood directors are able to credibly say is that stockholders will never understand the relevant information as deeply as the directors do or that the stockholders might choose to blind themselves to it in favor of a short-term return. Some of the directors, e.g., Andrew Shore, also attributed the possibility for confusion to "securities laws" that supposedly inhibit the directors from being as optimistic publicly as they are privately.

In sum, the evidence is insubstantial that would support any conclusion that, as of the end of November 1999, there was a real risk that the Shorewood stockholders would not be able to grasp the information necessary to make an informed judgment about whether to sell their stock or to execute a consent on behalf of Chesapeake. Given the fact that at that time *over 80%* of Shorewood's shares were held by management and institutional holders, the board's own ability to undertake more vigorous communication efforts, and the fact that reputable analysts were already tracking the stock, the risk of confusion was at best quite a weak one. As important, I reiterate that I believe it is more likely that the board did not in fact focus on this particular threat until later board meetings.

### G. How The 66 2/3% Supermajority Bylaw Supposedly Addressed These Threats

The reasons the Shorewood board believed that the 66 2/3% Supermajority Bylaw addressed the threats of price inadequacy and stockholder confusion are less than clear. At the core, these reasons center on the word "focus." During this litigation, many of the Shorewood directors have echoed the concept that the 66 2/3% Supermajority Bylaw was responsive to

19.  Kamsky Dep. at 92–93.

the threats of price inadequacy and stockholder confusion because the Bylaw engendered greater "focus." Marc Shore, for example, testified at deposition that "the key to the super majority was to get the majority of the stockholders to focus on what the issues were and . . . the value of what Chesapeake was offering."[20] According to him, under the old bylaws a minority could change how the company was could run, and he wished to change that. Apparently, Shore was referring to the fact that before the Defensive Bylaws were adopted, Shorewood stockholders could call a special meeting at which the majority of a quorum could amend the bylaws. In any consent solicitation, a majority of all outstanding shares was required by statute, the Shorewood bylaws notwithstanding.[21]

But directors Kamsky and Fairley articulated the concept of "focus" in a manner more consistent with the 66 2/3% Supermajority Bylaw. They testified that the board wanted more than a majority of the shares to decide issues as important as the ones likely to be at stake in a contested consent solicitation or proxy fight to amend the Shorewood bylaws. As Fairley put it, the board felt that "major action . . . should be the result of the considered focus of a broad number of stockholders, [a] considered consensus . . . ."[22]

At other times, however, Shorewood directors suggested that their concentration on "focus" was based on their desire to see the stockholders focus on the important issues to be decided. For example, both Marc Shore and Verebay say that the Supermajority Bylaw would and was intended to make Shorewood stockholders "focus on the issues."[23] Some of the directors

simply blended these different rationales. Bannon testified the board "wanted to make certain that there was a very informed, focused consensus among the shareholders in terms of understanding the company's potential so that they could make the best possible decision."[24]

During this litigation, the defendants and their lawyers have advanced no rational explanation of how the supermajority voting requirement serves to make voters more focused. Thus that purpose cannot sustain the Supermajority Bylaw and I will therefore give it no further consideration.

Rather, I will assume that the Shorewood board felt that it was desirable that something close to a consensus of stockholders decide any consent solicitation or proxy fight to amend the bylaws and that the board believed that the 66 2/3% Supermajority Bylaw would require that consensus.

It is clear, in that regard, that the principal bylaw amendment feared by the board—particularly by Marc Shore and the other insiders—was the elimination of the company's classified board structure, which would allow the subsequent removal of the incumbent board. Put in plain terms, the board's desire for a "focused consensus" could be called a euphemism for greatly increasing the number of votes the stockholders needed to unseat the directors. In combination with the elimination of stockholder-called special meetings, the 66 2/3% Supermajority Bylaw raised that bar substantially.

### H. Shorewood Goes Public With Its Battle With Chesapeake

After the November 18 board meeting, Shorewood issued a press release in which

**20.** M. Shore Dep. at 172.

**21.** 8 *Del. C.* § 228(a).

**22.** Fairley Dep. II at 46.

**23.** M. Shore Dep. at 339; Verebay Dep. at 57, 63.

**24.** Bannon Dep. at 46.

it announced that its board had rejected Chesapeake's heretofore non-public $16.50 per share offer, and that Chesapeake's board had likewise rejected Shorewood's non-public $40 per share offer.

Chesapeake responded with a November 22, 1999 public letter from Johnson to the Shorewood board, in which Johnson emphasized Chesapeake's willingness to negotiate and possibly to "increase our offer with appropriate due diligence and access to your [Shorewood's] business plan. We [Chesapeake] also stand ready to discuss alternatives to an all-cash structure that may offer a tax-advantaged alternative for your stockholders." [25] Shorewood responded with a communication emphasizing the gross inadequacy of Chesapeake's bid and the fact that the company was not for sale.

### I. The Shorewood Board Executes A Written Consent Adopting The Bylaw Amendments

The Shorewood board supposedly voted to approve the bylaw amendments at their phone meeting on November 18. But the directors subsequently executed a written consent confirming the adoption of the bylaw amendments. At the time they were asked to execute the consent, the directors had not been provided with a text of the amendments. Yet the board members signed anyway, including Bannon and Verebay, who had not attended the November 18 meeting.

### J. Shorewood Hires An "A Team" Of Advisors

After the November 18 board meeting, Marc Shore and Kamsky began to be concerned about whether Shorewood had the advisors necessary to see them through the Chesapeake situation. They wanted an "A Team." Thus, Kamsky offered to go out and shop for investment bankers and private investigators. Eventually, the Bryan Cave firm was supplemented by Skadden, Arps, Slate, Meagher & Flom; Shorewood also engaged Bear, Stearns & Co. Inc., Jefferson Capital, and Greenhill & Company as investment bankers; and Innisfree M & A Incorporated was retained as proxy solicitor for Shorewood.

### K. Chesapeake Buys 14.9% of Shorewood's Stock From Shorewood's Largest Shareholder

An obvious target in the Chesapeake/Shorewood struggle was Ariel Capital Management, Inc., an investment advisory firm that was Shorewood's single largest stockholder. Ariel owned over 20% of Shorewood's shares and had owned a substantial block of shares in the company during the entire 1990s. Ariel's position equaled 5.6 million shares of Shorewood stock, which Ariel held on behalf of its clients. Ariel had "sole voting power" regarding the shares. As one would expect, Ariel views itself as having a fiduciary duty to maximize the total return for its clients.

Given Ariel's interests, it was logical for both the Shorewood and Chesapeake boards to find out Ariel's view of the now public situation involving the two companies. Indeed, it is clear that communication with Ariel was an early agenda item for Shorewood insiders after receiving the Chesapeake offer.[26]

Chesapeake contacted Ariel on November 19, 1999 and arranged a meeting for November 23. At the meeting, Johnson

---

25. JX 2, at 13.

26. Indeed, Ariel called Marc Shore after the bids became public to hear Shore's "ratio-

nale" for the position Shorewood was taking vis-à-vis Chesapeake. Morton Dep. at 36.

and other members of Chesapeake management made a presentation to Franklin Morton, Ariel's Director of Research, and other Ariel representatives. Much of the Chesapeake presentation focused on the inherent business logic of combining the two companies. Like the Chesapeake and Shorewood boards, Ariel understood—based on the presentation and its own research—this logic to be sensible and reached the view that a strategic combination was, putting price aside, advisable.

Being an investment advisory firm, Ariel could not, of course, put price aside. It communicated its view that the $16.50 offer was off the mark.

At the end of the meeting, the Chesapeake representatives raised the issue of purchasing enough of Ariel's shares to obtain 14.9% of Shorewood's stock with upside protection. Chesapeake indicated that it might be able to offer Ariel a small premium over $16.50 a share. The record is clear that Chesapeake was careful to limit itself to the 14.9% level because of 8 *Del. C.* § 203. Its intention was to stop short of any agreement that would make Chesapeake "an interested stockholder" under that statute.

Negotiations ensued the following week. Ariel was unwilling to sell without substantial upside protection, because it viewed the value of Shorewood to be in the $20 to $25 range. On the other hand, Ariel viewed the quickest route to obtaining a value in that range to be a sale of the company, which the current Shorewood board opposed.

To balance its interest in stimulating a value-maximizing sales process and in not selling to Chesapeake at a low price, Ariel secured a guarantee from Chesapeake that if Shorewood engaged in a transaction involving the exchange of a majority of its shares (a "Majority Transaction"), then Ariel would get to share in the upside.

Without such a guarantee, Ariel would not have sold its shares.

For its part, Chesapeake was willing to provide the upside protection, because this protection provided an incentive for Ariel to support a Majority Transaction. Chesapeake also realized that Ariel was—as almost every stockholder is—economically motivated and would want price protection.

On November 26, 1999, an agreement was reached (the "Ariel Agreement") for Ariel to sell shares equal to 14.9% of Shorewood's outstanding shares (the "Purchased Shares") at $17.25 apiece. In the event of a future Majority Transaction, Ariel would receive additional consideration. In a Majority Transaction in which Chesapeake was the winning bidder, Ariel would receive an additional payment equal to the difference between $17.25 and the winning Chesapeake bid. In a Majority Transaction in which anyone (including Shorewood itself) was the winning bidder, Ariel would receive an additional payment equal to the difference between $17.25 and the midpoint between the highest Chesapeake bid and the winning bid.

The Ariel Agreement left Ariel still holding a substantial block of Shorewood shares (the "Non–Purchased Shares"). While the defendants dispute Chesapeake's version of what the Ariel Agreement says, it is clear that Chesapeake and Ariel see the Agreement as leaving Ariel with the freedom to vote those shares as it wishes. Similarly, while the defendants characterize Chesapeake as having sought and obtained Ariel's broad support for a Chesapeake-led acquisition of Shorewood, the evidence does not bear out Shorewood's characterization. It is apparent that Ariel came to the view that a Shorewood–Chesapeake combination was logical (which the defendants must concede is true) and that Chesapeake was well-posi-

tioned to close a purchase of Shorewood. Beyond that Ariel refused to go, except insofar as it could guarantee that it would benefit from an acquisition of Shorewood at a price higher than $17.25 *by anyone.*

In sum, Ariel had guaranteed that the Purchased Shares would share in the upside of any Majority Transaction at a higher price. Because Ariel had sold the bulk of its position in Shorewood, the upside incentives are a factor in how Ariel maximizes its total return from the Purchased Shares and the Non–Purchased Shares. In simple terms, Ariel has a substantial economic incentive to support a Majority Transaction even in some situations where it believes that the company is worth more under its current business plan than is being offered by the acquiror or where a non-Majority Transaction—such as a partial repurchase—offers more value than a Majority Transaction. That is because Ariel's total economic return is based on the proceeds it receives for both the Purchased and Non–Purchased Shares, a bottom line influenced in some situations (discussed below) by whether the upside protection offered by the Ariel Agreement is triggered or not.

But there is no circumstance in which Ariel has an incentive to support a Chesapeake Majority Transaction over a Majority Transaction at a higher price proposed by any other person, including Shorewood.

L. *Chesapeake Publicizes The Ariel Agreement, Makes An All–Cash, All–Shares Tender Offer To Purchase Shorewood For $17.25 A Share, And Sues To Invalidate The Defensive Bylaws*

On November 29, 1999, Chesapeake announced the Ariel Agreement by press release, stating that the Agreement "validates [the] view that Chesapeake's acquisition of Shorewood makes great sense for Shorewood's stockholders." [27] Although Chesapeake indicated that a Schedule 13–D with additional information would be filed, Chesapeake's press release omitted any mention of the upside protection in the Ariel Agreement. That omission appears to have been other than inadvertent.

On December 3, 1999, Chesapeake commenced a tender offer for all the shares of Shorewood at a price of $17.25 a share (the "Tender Offer"). Chesapeake also indicated that it intended to acquire any Shorewood shares remaining after closing the tender offer at the same price in a back end merger.

Because Shorewood has a shareholder rights plan in place, Chesapeake also announced a consent solicitation (the "Consent Solicitation"). Through the Consent Solicitation, Chesapeake sought:

- to amend the Shorewood bylaws to eliminate the classified board provision and create a three-person board;

- to remove the sitting members of the Shorewood board; and

- to elect a new board that would make the decision whether to dismantle any defenses impeding the procession of the Tender Offer.

The same day, Chesapeake commenced litigation in this court to, among other things, enjoin the Defensive Bylaws, including the 66 2/3% Supermajority Bylaw.

M. *The Shorewood Board Rejects The $17.25 Tender Offer*

The Shorewood board met on December 9 and December 15, 1999 to consider the Tender Offer. At the latter meeting, the board unanimously decided to reject the Tender Offer as inadequate.

27. JX 19.

A good deal of what happened at these meetings has been shielded by the defendants from disclosure on grounds of privilege. For example, the board received the advice of Bear Stearns that the Tender Offer was inadequate in price. But the defendants refused to produce the analyses or information underlying that advice on grounds of the business strategy privilege. For that reason, I cannot give it weight.

In essence, the Shorewood board appears to have rejected the Tender Offer for reasons similar to those motivating its rejection of the $16.50 per share offer. The board believed that the Tender Offer price did not reflect the intrinsic value of the company, was below the level at which comparable companies had been sold, and was timed to take advantage of a lull in Shorewood's stock price.

In addition, the Shorewood board claims to have continued to focus on stockholder confusion as a threat arising from the Chesapeake overtures. In contrast to Shorewood, I believe that the December meetings were when the "confusion" threat first rose to the fore—after Shorewood had armed itself with its "A Team" of advisors.

During the course of these meetings, the Shorewood board also identified a new threat arising out of the Ariel Agreement. This threat was based on the defendants' litigation position that the Ariel Agreement made Chesapeake an "interested stockholder" under 8 *Del. C.* § 203. If this is determined by a court to be the case, then Chesapeake will most likely be unable to consummate a merger or other major transaction with Shorewood for three years.

### N. *Shorewood Asks Its Stockholders To Withhold Consents From Chesapeake*

Shorewood responded to Chesapeake's consent solicitation efforts with its own counter-effort to obtain the revocation of any consents given to Chesapeake and to persuade other Shorewood shareholders not to consent in the first instance.

To those ends, on December 16, 1999, Shorewood filed a Schedule 14D–9 explaining in great detail why the Shorewood board believed that the Tender Offer (on which the Consent Solicitation was premised) was inadequate. These reasons, included, but were by no means limited to:

- the opportunistic way Chesapeake's offer was timed to take advantage of a short-term weakness in Shorewood's share price;
- the fact that "Chesapeake's price offer represents a 15% to 20% discount to the one year target prices for Shorewood's stock (without taking into account any extraordinary transactions) which have been announced by several major Wall Street brokerage firms that cover Shorewood";
- the Shorewood board's belief that "Chesapeake's offer represents an attempt by Chesapeake to usurp for itself the future growth in revenues, net income and cash flow and stock price appreciation that are only beginning to result from Shorewood's recent capital expenditures and other initiatives aimed at making Shorewood the premier global supplier of value-added packaging";
- the § 203 risk presented by Chesapeake's contract with Ariel; and
- the board's view that, based on unsolicited inquiries from third parties, Shorewood has a variety of other strategic alternatives available to it.[28]

28. JX 2, at 18–19.

To the Shorewood board's credit, the 14D–9 contains a very readable four-page discussion of the factors that led it to oppose the Tender Offer and Consent Solicitation. That discussion presents information about how the price of the Tender Offer compared unfavorably to Shorewood's fifty-two week trading high and historic price to earnings ratio. Perhaps most importantly, the 14D–9 discusses Shorewood's global strategy, the benefits of its China strategy and the Queens acquisition, and the likely effects of the company's other capital investments. *That is, the 14D–9 addresses all of the issues that the Shorewood directors feared its stockholders would slight in considering the Tender Offer.*

### O. *Chesapeake Draws Pitiful Support From The Shorewood Stockholders*

By late December, it became clear that the Shorewood directors' worst fears about stockholder confusion were not coming to pass. On the contrary, early returns showed that less than 1%—yes, one percent—of the Shorewood shares had been tendered to Chesapeake.

Apparently, Shorewood stockholders were heeding the advice of Shorewood as well as the advice of brokerage houses like Salomon Smith Barney, which had issued a November 30, 1999 report placing a one-year $20 target on Shorewood's stock.

### P. *The Shorewood Board Amends The Supermajority Bylaw The Week Before Trial*

On January 5, 2000—a little over a week before the trial in this case was scheduled to start—Marc Shore called a telephonic meeting of the Shorewood board. The purpose of the meeting was to consider reducing the Supermajority Bylaw's voting requirement from 66 2/3% to 60%. The directors did not receive prior notice of this purpose. The pendency of this litigation obviously motivated consideration of the change.

At the meeting, the discussion of amending the 66 2/3% Supermajority Bylaw lasted about forty-five minutes. The only professional advisor who provided input to the board was a representative of Innisfree, Arthur Crozier, who joined the board meeting by phone for "5 minutes. Not even." [29]

Crozier did not give a formal presentation. Indeed, Marc Shore was unwilling to characterize Crozier's remarks as "advice," and the day after the meeting Kamsky testified that Crozier said "[n]othing that was significant enough to make an impression." [30]

The one piece of information Crozier provided was to tell the board that, based on his experience as a proxy solicitor, Shorewood could expect a 95% turnout in the Consent Solicitation. The board asked no questions about the basis for Crozier's opinion, which consisted of his review of a one page description of Shorewood's stockholder base by category and his own extensive experience in the proxy solicitation field. As a matter of fact, Crozier's analysis was superficial compared to that which he and his company usually rely upon to advise their clients.

After this cursory input, the board resolved to reduce the vote requirement to 60% based on the following logic. First, the board members say that they believed that the decision of whether to sell Shore-

---

**29.** Kamsky Dep. at 161.

**30.** M. Shore Dep. at 353; Kamsky Dep. at 161; *see also* Kamsky Dep. at 77 (the day after the 1/5/00 meeting failing to recall which meeting Crozier attended).

wood or change its board should be made by disinterested stockholders with the pure motive of maximizing Shorewood's value.

Second, the board believed that Chesapeake, as an acquiror, had a different interest than other Shorewood stockholders because it wished the price of acquisition to be as low as possible.

Third, the board believed that the Ariel Agreement tainted Ariel's motives and made it "interested." But the board seemed to base this conclusion on ignorance about Ariel's actual incentives. The two directors who testified at trial believed that Ariel had an incentive to vote the Non–Purchased Shares with Chesapeake in all circumstances, for example, even when a higher third party acquisition bid was on the table. Their view of Ariel's interests was mistaken and was premised on what they had been told by the company's management and advisors.

Fourth, the board continued to adhere to its belief that it was important, in view of the confusion issue, that a "focused" group of stockholders decide these important questions. At this stage, this concept was still vague and involved both the ideas that a "focused consensus" should support major action like bylaw changes and that the electorate itself should be "focused" on the relevant issues at stake.

Fifth, the board never harbored for a moment the thought that any of its own members might be "interested," under its own definition. On the contrary, they believed in one another and believed that even Marc Shore was disinterested. In this regard, the board did not give any weight to the fact that all of its members had already committed to vote against the Consent Solicitation. Nor did the board do any analysis of whether any board members' non-stock interests in the company (salaries, benefits, access to loans, consulting agreements) distorted their voting incentives in a manner similar to how the board felt Ariel's voting incentives were distorted.

Using these premises as their foundation, the board reasoned that 60% was a fair number because it enabled a "majority" of the disinterested shareholders to decide the Consent Solicitation. The math works as follows:

100% Shorewood outstanding shares

- 20% "interested" Chesapeake/Ariel block
- 80% "disinterested" votes
- Half of 80% equals 40% of the disinterested votes
- 40% + 20% = 60%

Thus, Chesapeake had to get a majority (actually half) of the 80% "disinterested vote"—which included Shorewood management's 23.88% holdings—to support its consent solicitation in order to win.

The board, however, never considered whether it was reasonably practicable for Chesapeake or any other third party opposed by the board to win under these rules. It received no advice regarding that issue. As Kamsky testified:

Q. Do you recall anyone opining, either a director or professional, that they believed that it was reasonably possible for Chesapeake to attain a 60 percent vote in order to amend the bylaws of Shorewood?

A. It didn't come up as an issue.

Q. Was it discussed by the directors whether it would be reasonably practical or reasonably probable for any shareholder to obtain 60 percent of the total outstanding shares in order to amend the bylaws?

A. It wasn't discussed.[31]

Nor did the board consider whether Chesapeake's lack of success in soliciting tenders should lead it to reconsider whether any supermajority voting requirement was needed. Likewise, the board never considered whether lesser alternatives were sufficient to deal with the threat of confusion—such as ensuring that the record date was set in a manner that afforded the time for both sides to get out their message or stepping up Shorewood's own public communications strategy.

## IV. *The Claims Of The Parties*

This action was filed on December 3, 1999. A hearing on Chesapeake's motion to expedite was held shortly thereafter. At that hearing, the defendants opposed the motion. Over their objection, I ordered expedition. At that time, however, the defendants persuaded me that if expedited proceedings were to occur, they should culminate in a trial rather than a preliminary injunction hearing so that the court could assess the credibility of the parties. As a result, a trial was held in mid-January 2000.

The trial was not intended to address all of the issues raised in the litigation in a final way; however, it was intended to address the most pressing issues on a final basis. At trial, Chesapeake elected to press the following arguments:

- The Supermajority Bylaw is invalid because the Bylaw was intended to and has the effect of disenfranchising Chesapeake and precluding it from conducting a successful Consent Solicitation. The disloyal motive for the Supermajority Bylaw was entrenchment, Chesapeake says, and the defendants breached their duty of care by adopting that Bylaw on an grossly uninformed basis.

- The Supermajority Bylaw is *per se* invalid because a board of directors may not limit the stockholders' ability to amend the bylaws by imposing a higher than majority vote requirement.

For their part, the defendants elected to pursue two of their counterclaims:

- The Ariel Agreement makes Chesapeake an interested stockholder under 8 *Del. C.* § 203 because it either (i) binds Ariel to vote the Non–Purchased Shares with Chesapeake in any tender offer or consent solicitation or (ii) so incentivizes Ariel to vote its Non–Purchased Shares with Chesapeake that Chesapeake and Ariel must be said to have an "agree-

---

**31.** Kamsky Dep. at 163; *see also* Crozier Dep. at 26–29:

> Q. Do you also, as part of your work that you perform, that Innisfree performs for its clients, counsel clients regarding the probabilities of success in a solicitation of vote be it by proxy or consent?
> A. Yes.
> Q. Do you counsel clients in connection with the probabilities of success that some outside party that might also—some stockholder or other group might be soliciting proxies or consents probabilities that that group might succeed or not succeed?
> A. Yes.
> Q. ... To your knowledge, did anyone yesterday provide advice to the board of Shorewood on the subject of if the 60 percent bylaw amendment is adopted the probability that Chesapeake will be successful in its consent solicitation? Did anyone provide advice on that subject?
> A. I don't believe so.
> Q. Did anyone provide advice to the board yesterday on the converse of that; that is, if the 60 percent bylaw is adopted the probability that the company, Shorewood, might be successful in resisting such a consent solicitation by Chesapeake, either by revocations of consent or in some other way? Was that advice provided?
> A. No.

ment, arrangement, or understanding for the purpose of voting" the Non–Purchased Shares.

- The Delaware General Corporation Law forbids Shorewood stockholders from amending their corporation's bylaws to eliminate a staggered board provision and then installing a new board. Rather, the Shorewood stockholders can only fully eliminate the staggered board system by waiting until the terms of the current directors end. Otherwise, an impermissible removal without cause is effected.

I will address these arguments in the following order:

- in Section V of this opinion, I consider Chesapeake's argument that the Supermajority Bylaw is invalid under various standards of judicial review;

- for reasons I explain briefly in Section V, I see no need to reach Chesapeake's claim that the Supermajority Bylaw is *per se* invalid;

- in Section VI, I address the defendants' argument that the Chesapeake Consent Solicitation constitutes an improper and impermissible removal without cause of the Shorewood directors; and

- finally, in Section VII, I grapple with the defendants' claim that Chesapeake is an interested stockholder

under 8 *Del. C.* § 203 by virtue of the Ariel Agreement.

## V. Was The Supermajority Bylaw Validly Adopted?

### A. What Is The Relevant Standard Of Review: Unocal or Blasius?

Chesapeake and the defendant-directors part company on the standard of review that should apply to examine the validity of the Supermajority Bylaw. For its part, Chesapeake contends that the defendant-directors' primary purpose in adopting the Supermajority Bylaw was to interfere with or impede the exercise of the shareholder franchise. As such, Chesapeake argues that the compelling justification standard set forth in *Blasius Industries, Inc. v. Atlas Corp.* applies.[32]

The defendant directors counter that the Supermajority Bylaw is not preclusive of stockholder action to amend the Shorewood bylaws. Moreover, the Bylaw was adopted as a defensive measure against a hostile tender offer. Therefore, the defendant directors argue that cases like *Kidsco Inc. v. Dinsmore,*[33] *H.F. Ahmanson & Co. v. Great Western Financial Corp.,*[34] and *Golden Cycle, LLC v. Allan,*[35] dictate that the *Unocal* standard of review is singularly applicable. This clash of arguments forces me to address an issue that our courts have struggled with for over a decade: to what extent is the *Blasius* standard of review viable as a standard of

**32.** Del.Ch., 564 A.2d 651 (1988). Chesapeake also argues that the entire fairness standard applies because a majority of the Shorewood board is interested. *Unocal,* however, appears to preclude the use of the entire fairness standard to defenses that do not implicate 8 *Del.C.* § 144. How else can one make sense of *Unocal*'s use of an independent board majority as a factor enhancing the reasonableness of a board's action? 493 A.2d at 955. In any event, if the defendants' actions fail

*Unocal* or *Blasius,* I will make clear whether they were unfair or not.

**33.** Del.Ch., 674 A.2d 483 (1995), *aff'd and remanded,* Del.Supr., 670 A.2d 1338 (1995).

**34.** Del.Ch., C.A. Nos. 15650, 15549, 15555–15557, mem. op., Jacobs, V.C., 1997 WL 305824 (June 3, 1997, rev. June 9, 1997).

**35.** Del.Ch., C.A. No. 16301, mem. op., Lamb, V.C., 1998 WL 276224 (May 20, 1998).

review independent of *Unocal* in a case where *Unocal* would otherwise be the standard of review?

In analyzing this question, it is helpful to consider the context in which *Blasius* arose. In that case, the Atlas Corporation board was confronted with a consent solicitation effort by a 9% stockholder, Blasius Industries, that, if successful, would have resulted in an expansion of the Atlas board and the election of a new board majority. The consent solicitation effort was part of a larger effort by Blasius to cause Atlas to engage in a recapitalization that would have paid a huge special dividend to stockholders, but also have left Atlas in a highly leveraged condition. To prevent Blasius Industries from successfully electing a new board majority, the Atlas board elected two new directors to unfilled vacancies. The election of the two directors precluded Blasius Industries from electing a new board majority.

Chancellor Allen found that the Atlas board held a good faith belief that the recapitalization proposed by Blasius Industries was inadvisable for Atlas stockholders and that it was this belief, rather than entrenchment motives, that drove its actions. As a result, he could not rely on the case of *Schnell v. Chris–Craft Industries, Inc.*,[36] to invalidate the board's action as inequitably motivated. Thus he found that the real question was "whether, in these circumstances, the board, even if it *is* acting with subjective good faith (which will typically, if not always, be a contestable or debatable judicial conclusion), may validly act for the principal purpose of preventing the shareholders from electing a majority of new directors. The question thus posed is not one of intentional wrong (or even negligence), but one of authority *as be-*

tween the fiduciary and the beneficiary ...."[37]

Chancellor Allen held that the traditional business judgment rule standard of review (or even the heightened scrutiny of *Unocal*) was an inappropriate one to apply to answer that question for the following reasons:

[T]he ordinary considerations to which the business judgment rule originally responded are simply not present in the shareholder voting context. That is, a decision by the board to act for the primary purpose of preventing the effectiveness of a shareholder vote inevitably involves the question who, as between the principal and the agent, has authority with respect to a matter of internal corporate governance. That, of course, is true in a very specific way in this case which deals with the question who should constitute the board of directors of the corporation, but it will be true in every instance in which an incumbent board seeks to thwart a shareholder majority. A board's decision to act to prevent the shareholders from creating a majority of new board positions and filling them does not involve the exercise of *the corporation's power* over its property, or with respect to *its* rights or obligations; rather, it involves allocation, between shareholders as a class and the board, of effective power with respect to governance of the corporation.... Action designed principally to interfere with the effectiveness of a vote inevitably involves a conflict between the board and a shareholder majority. Judicial review of such action involves a determination of the legal and equitable obligations of an agent towards his principal. This is not, in my opinion, a question that a court may

---

**36.** Del.Supr., 285 A.2d 437 (1971).

**37.** *Blasius,* 564 A.2d at 658.

leave to the agent finally to decide so long as he does so honestly and competently; that is, it may not be left to the agent's business judgment.[38]

But Chancellor Allen eschewed a *per se* rule invalidating board actions taken "for the primary purpose of thwarting the exercise of a shareholder vote."[39] While recognizing that such actions were highly suspect, Chancellor Allen feared that "some set of facts [might exist that] would justify such extreme action."[40] He therefore adopted a standard that permitted such board action to stand only if it was supported by a compelling justification.[41]

Upon applying that standard, Chancellor Allen found that the Atlas board's justification—that the Atlas stockholders would be confused and mistakenly believe that the Blasius Industries' proposed recapitalization was advisable and elect a new board majority on that basis—was insufficient:

The board ... was presented with a consent solicitation by a 9% shareholder. Moreover, here it had time (and understood that it had time) to inform the shareholders of its views on the merits of the proposal subject to stockholder vote. The only justification that can, in such a situation, be offered for the action taken is that the board knows better than do the shareholders what is in the corporation's best interest. While that premise is no doubt true for any number of matters, it is irrelevant (except insofar as the shareholders wish to be guided by the board's recommenda-

tion) when the question is who should comprise the board of directors. The theory of our corporation law confers power upon directors as the agents of the shareholders; it does not create Platonic masters. It may be that the Blasius restructuring proposal was or is unrealistic and would lead to injury to the corporation and its shareholders if pursued. Having heard the evidence, I am inclined to think it was not a sound proposal. The board certainly viewed it that way, and that view, held in good faith, entitled the board to take certain steps to evade the risk it perceived. It could, for example, expend corporate funds to inform shareholders and seek to bring them to a similar point of view. But there is a vast difference between expending corporate funds to inform the electorate and exercising power for the primary purpose of foreclosing effective shareholder action. A majority of the shareholders, who were not dominated in any respect, could view the matter differently than did the board. If they do, or did, they are entitled to employ the mechanisms provided by the corporation law and the Atlas certificate of incorporation to advance that view.[42]

In the wake of *Blasius*, Delaware courts have struggled with how broadly that case should be applied. In retrospect, this difficulty might have been anticipated. Because the test is so exacting—akin to that used to determine whether racial classifications are constitutional[43]—whether it

---

38. *Id.* at 659–60.

39. *Id.* at 660.

40. *Id.* at 662.

41. *Id.* at 660–63 (drawing this standard from *Aprahamian v. HBO & Company*, Del.Ch., 531 A.2d 1204 (1987) and *Phillips v. Insituform of North America, Inc.*, Del.Ch., C.A. No. 9173,

mem. op., Allen, C., 1987 WL 16285 (Aug. 27, 1987)).

42. *Id.* at 662–63 (citations omitted).

43. See, e.g., *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Palmore v. Sidoti*, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984).

applies comes close to being outcome-determinative in and of itself. Therefore, in a moment of rather remarkable candor, the Delaware Supreme Court stated: the *Blasius* "burden of demonstrating a 'compelling justification' is quite onerous, *and is therefore applied rarely.*"% [44]

Of course, the fact that a test is "onerous" is not a reason not to apply it if the circumstances warrant. But it is not easy in most cases to determine whether the *Blasius* standard should be invoked. It is important to remember that it was undisputed in *Blasius* that the board's actions precluded the election of a new board majority and that the board intended that effect. As such, Chancellor Allen had no difficulty in concluding that the "board acted for the primary purpose of thwarting the exercise of a shareholder vote." [45]

In the more typical case involving board actions touching upon the electoral process, the question of whether the board's actions are preclusive is usually hotly contested. And the preclusion question and the issue of the board's "primary purpose" are not easily separable. The line between board actions that influence the electoral process in legitimate ways (e.g., delaying the election to provide more time for deliberations or to give the target board some reasonable breathing room to identify alternatives) and those that preclude effective stockholder action is not always luminous. Absent confessions of improper purpose, the most important evidence of what a board intended to do is often what effects its actions have.

In such a case, the court must be rather deep in its analysis before it can even determine if the *Blasius* standard properly applies. Put another way, rather than the standard of review determining how the court looks at the board's actions, how the court looks at the board's actions influences in an important way what standard of review is to apply.

In addition, the Delaware Supreme Court and this court have both recognized the high degree of overlap between the concerns animating the *Blasius* standard of review and those that animate *Unocal.* For example, in *Stroud v. Grace,* [46] the Delaware Supreme Court held that *Unocal* must be applied to any defensive measure touching upon issues of control, regardless of whether that measure also implicates voting rights. In so ruling, the Court noted that "[b]oard action interfering with the exercise of the franchise often ar[ises] during a hostile contest for control where an acquiror launch[es] both a proxy fight and a tender offer." [47] When a case involves defensive measures of such a nature, the trial court is not to ignore the teaching of *Blasius* but must "recognize the special import of protecting the shareholders' franchise within *Unocal's* requirement that any defensive measure be proportionate and 'reasonable in relation to the threat posed.'" [48] Therefore, a "board's unilateral decision to adopt a defensive measure touching upon issues of control that purposely disenfranchises its shareholders is strongly suspect under *Unocal,* and cannot be sustained without a compelling justification." [49]

The Supreme Court's *Unitrin* opinion seems to go even further than *Stroud* in integrating *Blasius's* concern over manip-

---

44. *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1376 (1996).

45. *Blasius,* 564 A.2d at 660.

46. Del.Supr., 606 A.2d 75, 82 (1992).

47. *Id.* at 92 n. 3.

48. *Id.* (*quoting Unocal,* 493 A.2d at 955).

49. *Id.* (quotations and citation omitted).

ulation of the electoral process into the *Unocal* standard of review. At issue in *Unitrin* (and discussed in greater detail in the next section of this opinion) was the arguably preclusive effect of a stock repurchase program that would have placed up to 28% of Unitrin's stock in the hands of its directors on a proxy contest to elect a new Unitrin board by another company, American General, that had made an all-cash, all-shares tender offer. In determining to reverse the trial court's decision to strike down the repurchase program, the Supreme Court focused a section of its opinion on the "Shareholder Franchise." [50] In that section, the Court emphasized the "assiduous[ness of] its concern about defensive actions designed to thwart the essence of corporate democracy by disenfranchising shareholders" and its acceptance of the " 'basic tenets' " of *Blasius.*[51] Because the board's actions came in the face of a tender offer coupled with a proxy fight, the Court cited extensively to *Stroud's* discussion of the interrelationship of *Blasius* and *Unocal* in such circumstances.

But when it came time to assess whether the Chancery Court's determination that the repurchase program was invalid was correct, the Supreme Court appeared to eschew any application of the compelling justification test. The Supreme Court did start its analysis with a sentence stating: "We begin our examination of Unitrin's Repurchase Program mindful of the special import of protecting the shareholder's franchise within *Unocal's* requirement that a defensive response be reasonable and proportionate." [52] Yet the Court never cited to *Blasius* after that point in its opinion, never referenced or applied the

compelling justification standard, and, to the contrary, emphasized the latitude a board of directors must be given to adopt reasonable defensive measures in its business judgment.

*Stroud* and *Unitrin* thus left unanswered the question most important to litigants: when will the compelling justification test be used, whether within the *Unocal* analysis or as a free-standing standard of review? Assuming the compelling justification language is to be taken seriously, whether that language applies could, of course, tilt the outcome of a *Unocal* analysis in an important way. After *Unitrin*, this question became even more consequential, because that opinion appeared to accord target boards of directors quite a bit of leeway to take defensive actions that made it more difficult for an insurgent slate to win a proxy fight.

Vice Chancellor Jacobs recognized the significance of this question in *Kidsco Inc. v. Dinsmore.* In that case, a board had adopted a bylaw amendment that ensured that its stockholders could vote on a merger agreement twenty-five days before a stockholder-bidder could call a stockholder-initiated board meeting in connection with its hostile tender offer. In the absence of the bylaw change, the special meeting to vote on directors would have been held two days after the merger vote, and thus a simultaneous election process would have taken place. The bidder argued that the *Blasius* compelling justification test must be employed, per *Stroud*, by the court in its *Unocal* review of the bylaw.

---

**50.** *Unitrin,* 651 A.2d at 1378–79 (quotations and citations omitted).

**51.** *Id.* at 1378 (*citing Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 42 n. 11 (1994)); *id.* at 1378–79 (*quoting Stroud,* 606 A.2d at 91).

**52.** *Id.* at 1379 (*citing Stroud,* 606 A.2d at 92).

Vice Chancellor Jacobs rejected that argument because the target board's action neither had the effect nor the purpose of impairing or impeding the exercise of the stockholder franchise. In so ruling, he noted that in past cases board action found to constitute "inequitable conduct relating to a shareholder vote ... had the effect (and, in some cases, also the intent) of either (i) precluding effective shareholder action ... *or* of (ii) 'snatch[ing] victory from an insurgent slate on the eve of a noticed meeting.'"[53]

Neither category was implicated by the target board's action. The target board's action simply gave the stockholders the opportunity to consider the merger free of confusion from a simultaneous electoral contest and gave the target board a reasonable opportunity to look for strategic alternatives if the merger vote failed. Once the merger vote was held, the bidder could obtain a vote on removing the board. Therefore, the bidder simply faced delay of a meeting that "had neither been called nor legally demanded" and was not precluded. Finally, because the court found that the target board was not motivated by entrenchment but by a legitimate desire to avoid stockholder confusion and to secure time to seek more favorable strategic alternatives, it could not have been said to have acted for the " 'primary purpose' of impairing or impeding the effective exercise of the franchise" nor would its actions "have that effect."[54]

After concluding that *Blasius* did not apply, Vice Chancellor Jacobs then applied *Unocal.* For the same reasons he found *Blasius* inapplicable—the presence of a legitimate purpose for the board's action independent of disenfranchisement and the lack of any preclusive effects flowing from that action—Vice Chancellor Jacobs concluded that the board satisfied *Unocal.*[55]

In subsequent cases, Vice Chancellor Jacobs and other members of this court have recognized that it is often impossible to distinguish the inquiry of whether a measure fails to pass muster under *Unocal* from the inquiry necessary to determine whether the *Blasius* standard of review even applies. For example, in *Carmody v. Toll Brothers, Inc.,*[56] Vice Chancellor Jacobs examined whether a complaint attacking a "dead hand" poison pill that could only be redeemed by continuing directors stated a claim under *Unocal* and/or *Blasius.* Because the dead-hand pill forced stockholders to vote for the incumbent directors in the election if they wished to elect a board with the authority to redeem the pill, he concluded that the pill was coercive. As a result, the complaint stated a claim under both *Unocal* and *Blasius.*[57]

Likewise, in several other cases this court has determined that a defensive measure affecting the electoral process was not preclusive and therefore did not trigger *Blasius.* In each case, the finding of non-preclusiveness also supported the court's determination that the measures

---

53. *Id.* at 495–96 (citations omitted; emphasis in original).

54. *Id.* at 496.

55. *Id.* at 496–97.

56. Del.Ch., 723 A.2d 1180, 1193–95 (1998).

57. *See also Mentor Graphics v. Quickturn Design Systems, Inc.,* Del.Ch., 728 A.2d 25, 37–40 (noting that a bidder's attack on a slow-hand poison pill and an advance notice bylaw amendment as coercive, as rendering futile an effort to obtain board control through a proxy contest, and therefore purposely disenfranchising under *Blasius* was premised on the "same reasons" that bolstered the bidder's claim that the measures were "coercive" under *Unocal* ), *aff'd sub. nom., Quickturn Design Systems, Inc. v. Shapiro,* 721 A.2d 1281 (1998).

were not draconian and within the range of reason under the *Unocal* test.[58]

In reality, invocation of the *Blasius* standard of review usually signals that the court will invalidate the board action under examination. Failure to invoke *Blasius*, conversely, typically indicates that the board action survived (or will survive) review under *Unocal*.

Given this interrelationship and the continued vitality of *Schnell v. Chris–Craft*, one might reasonably question to what extent the *Blasius* "compelling justification" standard of review is necessary as a lens independent of or to be used within the *Unocal* frame. If *Unocal* is applied by the court with a gimlet eye out for inequitably motivated electoral manipulations or for subjectively well-intentioned board action that has preclusive or coercive effects, the need for an additional standard of review is substantially lessened. Stated differently, it may be optimal simply for Delaware courts to infuse our *Unocal* analyses with the spirit animating *Blasius* and not hesitate to use our remedial powers where an inequitable distortion of corporate democracy has occurred. This is especially the case when a typical predicate to the invocation of *Blasius* is the court's consideration of *Unocal* factors, such as the board's purpose and whether the board's actions have preclusive or coercive effects on the electorate.

For purposes of this case, however, I must apply the law as it exists. That means that *Unocal* must be applied to the Supermajority Bylaw because of its defen-

---

**58.** *See Golden Cycle,* mem. op. at 17 (where the target board's decision to set an early and unannounced record date disenfranchised some holders and created confusion among others but would not "preclude" nor "substantially interfere" with a stockholder-bidder's consent solicitation to remove the target board, *Blasius* review was "unwarranted"); *Stahl v. Apple Bancorp, Inc.,* Del.Ch., 579 A.2d 1115, 1123 (1990) (when a change in the company's planned but not set meeting date did not preclude a fair directors' election, *Blasius* review was not applicable); *H.F. Ahmanson & Co.,* mem. op. at 39–41 (delay of fifty days in holding meeting did not "impede the effective exercise" of franchise and therefore did not trigger *Blasius;* for same reason, delay was not "preclusive nor coercive" under *Unocal* ); *Kidsco,* 674 A.2d 483 (discussed in text *supra* ).

In another case that applied only *Blasius,* it seems clear that an application of *Unocal* would have produced the same result. In *Commonwealth Associates v. Providence Health Care, Inc.,* Del.Ch., C.A. No. 13135, mem. op., Allen, C., 1993 WL 432779 (Oct. 22, 1993), the incumbent Providence board was threatened by a consent solicitation seeking to replace the incumbents with a new board. Before this threat had emerged, the Providence board had been negotiating an investment in another company called NuMed. Immediately before the threat emerged, the Providence board had been planning to buy 6% of NuMed's shares with an option to purchase another 40% over the next two years. After learning of the threat, the Providence board changed its plans significantly and bought 40% of NuMed's stock up front with an immediately exercisable option for another 10.1% and obtained the right to elect four of NuMed's eleven directors. In exchange, NuMed received 20% of Providence's outstanding stock. The deal was accompanied by a voting agreement committing the NuMed and Providence boards to support each other in elections, consent solicitations, and proxy contests.

Because the family of Providence's CEO already owned 30% of the company's stock, the issuance of the 20% to NuMed determined the outcome of the consent solicitation. Chancellor Allen found that the insurgent was likely to prevail on its claim that the NuMed deal was undertaken specifically to influence the outcome of the consent solicitation by ensuring that 20% of the vote was placed into friendly hands. As such, *Blasius* applied and Chancellor Allen preliminarily enjoined treatment of the NuMed shares as valid for voting or consent purposes.

An identical result could have been obtained under *Unocal* because the issuance of the shares precluded a successful consent solicitation to remove the Providence board.

sive origin.[59] To the extent that I further conclude that the Supermajority Bylaw was adopted for the primary purpose of interfering with or impeding the stockholder franchise, the Bylaw cannot survive a *Unocal* review unless it is supported by a compelling justification.[60]

To apply this approach in a reasoned manner, I will first examine the Supermajority Bylaw employing purely the *Unocal* standard. After examining the defendant's justifications for the Bylaw and whether the Bylaw is a proportionate response under *Unocal*, I will then determine whether the compelling justification standard of *Blasius* is implicated.

Although this order of examination may seem backwards, the defendant-directors' threat justification under the first prong of *Unocal* and the effect of the Bylaw on Chesapeake's ability to conduct a successful solicitation effort (as considered under the second prong of *Unocal*) both bear on whether I can conclude that the defendants' " 'primary purpose' " was "to interfere with or impede exercise of the shareholder franchise." [61]

## B. The Analytical Tension Between Acknowledgement Of "Substantive Coercion" As A Threat And A Board's Insistence That A Proxy Fight Is Winnable Because Its Electorate Is Highly Sophisticated And Incentivized To Vote

In some respects, this case unavoidably brings to the fore certain tensions in our corporation law. For example, several cases have stated that a corporate board may consider a fully-financed all-cash, all-shares, premium to market tender offer a threat to stockholders on the following premise: the board believes that the company's present strategic plan will deliver more value than the premium offer, the stock market has not yet bought that rationale, the board may be correct, and therefore there is a risk that "stockholders might tender ... in ignorance or based upon a mistaken belief ...." [62] A rather interesting term has emerged to describe this threat: "substantive coercion." [63]

One might imagine that the response to this particular type of threat might be time-limited and confined to what is necessary to ensure that the board can tell its side of the story effectively. That is, be-

**59.** *Stroud,* 606 A.2d at 92 n. 3; *Unitrin,* 651 A.2d at 1379.

**60.** *Stroud,* 606 A.2d at 92 n. 3.

**61.** *Id.* at 92.

**62.** *E.g., Unitrin,* 651 A.2d at 1384; *Paramount Communications, Inc. v. Time, Inc.,* Del.Supr., 571 A.2d 1140, 1154 (1990).

**63.** This term was adopted from an article by two scholars who were extremely skeptical of the extent to which this threat could support anything other than very carefully justified and proportionate defensive measures. *See* Ronald J. Gilson & Reinier Kraakman, *Delaware's Intermediate Standard For Defensive Tactics: Is There Substance To Proportionality Review?,* 44 BUS. LAW. 247, 267 (1989) (hereinafter, *"Delaware's Intermediate Standard "*). The Supreme Court case that first

adopted this term from this article, *Paramount Communications v. Time,* specifically stated that certain Chancery Court cases were "not in keeping with a proper *Unocal* analysis." 571 A.2d at 1153 (*citing, e.g., City Capital Associates v. Interco, Inc.,* Del.Ch., 551 A.2d 787 (1988)). Ironically, Professors Gilson and Kraakman referred to one of these cases, *Interco,* as reflecting a mode of *Unocal* review consistent with their recommendations. Gilson & Kraakman, *Delaware's Intermediate Standard,* 44 BUS. LAW. at 266 n.63 (citation omitted).

In other contexts, typically involving whether management has "coerced" stockholders, our law uses a more traditional and rigorous construction of the word coercion. *See, e.g., Brazen v. Bell Atlantic Corp.,* Del.Supr., 695 A.2d 43, 50 (1997).

cause the threat is defined as one involving the possibility that stockholders might make an erroneous investment or voting decision, the appropriate response would seem to be one that would remedy that problem by providing the stockholders with adequate information. The corporate board has, of course, many tools to accomplish that, but may legitimately need more time to ensure that it can get its message out to the marketplace.

In addition, it may be that the corporate board acknowledges that an immediate value-maximizing transaction would be advisable but thinks that a better alternative than the tender offer might be achievable. A time period that permits the board to negotiate for a better offer or explore alternatives would also be logically proportionate to the threat of substantive coercion.[64]

But our law has, at times, authorized defensive responses that arguably go far beyond these categories. Paradoxically, some of these defensive responses have caused our law to adopt a view of stockholder voting capabilities that is a bit hard to reconcile. In *Unitrin*, for example, the Supreme Court held that the target Unitrin board could protect its stockholder base from an all-cash, all-shares premium tender offer from American General on the grounds that the Unitrin stockholders were susceptible to accepting an inadequate price ignorantly or mistakenly.[65] At the same time, the Supreme Court held that it was not necessarily a disproportionate response to the American General offer for the Unitrin board to buy its stock

in a selective repurchase program at a price comparable to the tender offer price (thus arguably "substantively coercing" participants itself)[66] even though the selective repurchase program thereby increased the percentage of the company's stock in directors' hands to as much as 28%.

The Court held that the selective repurchase program was not *necessarily* preclusive of a successful proxy fight by the tender offeror on grounds that appear to be in tension with the Unitrin board's fear of substantive coercion. For purposes of analyzing whether American General could obtain the necessary votes to remove the Unitrin board (a majority of the quorum) or conclude a merger (a majority of the outstanding shares), the Court made certain assumptions:

- the turnout would be 90%;
- the Unitrin directors held 28% of Unitrin's stock;
- American General held 14.9% of Unitrin's stock;
- institutional investors held 42% of Unitrin's stock; and
- twenty institutions held 33% of Unitrin's stock.

Under these assumptions, American General had to win the following majorities of the unaligned votes to prevail:

- vote on election of directors: 64.12%
- vote on a merger: 74.73%

On their face, the required majorities, which exceed any margin ever achieved by President Franklin Roosevelt,[67] seem to

---

64. *Interco*, 551 A.2d at 797–800.

65. 651 A.2d at 1385.

66. Of course, Unitrin argued that it was offering "immediate liquidity" to those stockholders who wanted it, while protecting those who

did not. Those who did not were, one would think, less susceptible to substantive coercion.

67. In fact, Franklin D. Roosevelt defeated his opponent, Alfred M. Landon, in the 1936 presidential election with a 62% majority, his largest margin of victory in four presidential elections.

present a rather formidable and, one might daresay, preclusive barrier to the insurgent. But the Supreme Court concluded that on this evidence, the Chancery Court's determination that a successful proxy contest was not a realistic possibility could not be sustained and remanded the matter for further findings.

In order of importance, three reasons seemed to underlie the Supreme Court's conclusion that the repurchase program might not be preclusive. First, Unitrin's stockholder base was heavily concentrated within a small number of institutional investors. This concentration "facilitat[ed the] bidder's ability to communicate the merits of its position." [68] Second, the fact that the insurgent would have to receive majorities from the disinterested voters uncommon in hotly contested elections in republican democracies was of "*de minimis*" importance "because 42% of Unitrin's stock was owned by institutional investors." [69] As such, the Supreme Court found that "it is hard to imagine a company more readily susceptible [than Unitrin] to a proxy contest concerning a pure issue of dollars." [70] Finally, the Supreme Court was unwilling to presume that the directors' block—which was controlled almost entirely by non-management directors—would not sell for the right price or vote themselves out of office to facilitate such a sale. [71]

The first two premises of the Court's rejection of the Chancery Court's finding of preclusion seem somewhat contradictory to its acceptance of substantive coercion as a rationale for sweeping defensive measures against the American General bid. [72] On the one hand, a corporate electorate highly dominated by institutional investors has the motivation and wherewithal to understand and act upon a proxy solicitation from an insurgent, such that the necessity for the insurgent to convince over 64% of the non-aligned votes to support its position in order to prevail is not necessarily preclusive. On the other, the same electorate must be protected from substantive coercion because it (the target board thinks) is unable to digest management's position on the long-term value of the company, compare that position to the view advocated by the tender offeror, and make an intelligent (if not risk-free) judgment about whether to support the election of a board that will permit them to sell their shares of stock. [73]

If the consistency in this approach is not in the view that stockholders will always respond in a lemming-like fashion whenever a premium offer is on the table, then a possible reading of *Unitrin* is that corporate boards are allowed to have it both ways in situations where important stockholder ownership and voting rights are at stake. In approaching the case at hand, I apply a different reading of *Unitrin,* however.

Without denying the analytical tension within that opinion, one must also remember that the opinion did not ultimately validate the Unitrin defensive repurchase

---

68. *Id.* at 1383, n. 33.

69. *Id.* at 1381 n. 27.

70. 651 A.2d at 1383 (quotations omitted).

71. *Id.*

72. Unitrin had in place other defenses, including a poison pill.

73. *Unitrin* is not the first case in which this tension has emerged. Consider the following two sentences from *Time:* "At these June meetings, certain Time directors expressed their concern that Time stockholders would not comprehend the long-term benefits of the Warner merger. *Large quantities of Time shares were held by institutional investors."* 571 A.2d at 1148 (emphasis added).

program. Rather, the Supreme Court remanded the case to the Chancery Court to conduct a further examination of the repurchase program, using the refined *Unocal* analysis the Court set forth.[74] That analysis emphasized the need for trial courts to defer to well-informed corporate boards that identify legitimate threats and implement proportionate defensive measures addressing those threats.[75] It was open for the court on remand to conclude, after considering the relevant factors articulated by the Supreme Court, that the repurchase program was invalid.

I therefore believe it is open to and required of me to examine both the legitimacy of the Shorewood board's identification of "substantive coercion" or "stockholder confusion" as a threat and to determine whether the Supermajority Bylaw is a non-preclusive and proportionate response to that threat. Indeed, the importance to stockholders of a proper *Unocal* analysis can hardly be overstated in a case where a corporate board relies upon a threat of substantive coercion as its primary justification for defensive measures. Several reasons support this assertion.

As a starting point, it is important to recognize that substantive coercion can be invoked by a corporate board in almost every situation. There is virtually no CEO in America who does not believe that the market is not valuing her company properly. Moreover, one hopes that directors and officers can always say that they know more about the company than the company's stockholders—after all, they are paid to know more. Thus, the threat that stockholders will be confused or wrongly

eschew management's advice is omnipresent.

Therefore, the use of this threat as a justification for aggressive defensive measures could easily be subject to abuse. The only way to protect stockholders is for courts to ensure that the threat is real and that the board asserting the threat is not imagining or exaggerating it. In this respect, it bears emphasis that one of corporate management's functions is to ensure that the market recognizes the value of the company and that the stockholders are apprised of relevant information about the company. This informational responsibility would include, one would think, the duty to communicate the company's strategic plans and prospects to stockholders as clearly and understandably as possible. If management claims that its communication efforts have been unsuccessful, shouldn't it have to show that its efforts were adequate before using the risk of confusion as a reason to deny its stockholders access to a bid offering a substantial premium to the company's market price?[76] Where a company has a high proportion of institutional investors among its stockholder ranks, this showing is even more important because a "relatively concentrated percentage of [such] stockholdings would facilitate [management's] ability to communicate the merits of its position."[77]

This confusion rationale should also be tested against the information currently available to investors. The proliferation of computer technology and changes in the broadcast media industry have given investors access to abundant information about the companies in which they invest. The capability of corporations to communicate

---

74. *Unitrin,* 651 A.2d at 1388–89.

75. *E.g., id.* at 1387–88.

76. Or denying stockholders the ability to vote for a new board that will afford them such access.

77. *Unitrin,* 651 A.2d at 1383, n. 33.

with their stockholders has never been greater. And the future promises even easier and more substantial information flows.

Our law should also hesitate to ascribe rube-like qualities to stockholders. *If stockholders are presumed competent to buy stock in the first place, why are they not presumed competent to decide when to sell in a tender offer after an adequate time for deliberation has been afforded them?*

Another related concern is the fact that corporate boards that rely upon substantive coercion as a defense are unwilling to bear the risk of their own errors. Corporate America would rightfully find it shocking if directors were found liable because they erroneously blocked a premium tender offer, the company's shares went into the tank for two years thereafter, and a court held the directors liable for the investment losses suffered by stockholders the directors barred from selling. But, because directors are not anxious to bear *any* of the investment risk in these situations,[78] courts should hesitate before enabling them to make such fundamental investment decisions for the company's owners. It is quite different for a corporate board to determine that the owners of the company should be barred from selling their shares than to determine what products the company should manufacture.[79] Even less legitimate is a corporate board's decision to protect stockholders from erroneously turning the board out of office.[80]

It is also interesting that the threat of substantive coercion seems to cause a ruckus in boardrooms most often in the context of tender offers at prices constituting substantial premiums to prior trading levels. In the case of Shorewood, for example, shareholders had been selling in the market at the pre-Chesapeake Tender Offer price, which was much lower. Did Shorewood management make any special efforts to encourage these shareholders to hold?[81] While I recognize that the sale of an entire company is different from day-to-day sales of small blocks, one must remember that the substantive coercion rationale is not one advanced on behalf of employees or communities that might be adversely affected by a change of control.[82] Rather, substantive coercion is a threat to stockholders who might sell at a depressed price. The stockholder who sells in a depressed market for the company's stock without a premium is obviously worse off than one who sells at premium to that depressed price in a tender offer. But it is only in the latter situation that corporate boards commonly swing into action with extraordinary measures. The fact that the premium situation usually involves a possible change in management may play more than a modest role in that difference.

This leads to a final point. As *Unocal* recognized, the possibility that management might be displaced if a premium-producing tender offer is successful creates an inherent conflict between the interests of stockholders and management.[83] There is always the possibility that subjec-

---

78. *See* 8 *Del. C.* § 102(b)(7).

79. E. Norman Veasey, *The Defining Tension In Corporate Governance In America,* 52 BUS. LAW. 393, 394 (1997) (indicating that more searching judicial scrutiny is appropriate when directors make decisions about "ownership" rather than "enterprise" issues).

80. *Blasius,* 564 A.2d at 663.

81. No such efforts are reflected in the record.

82. Constituencies to which one, as a matter of social policy, might be extremely sympathetic but whose interests are of little, if no relevance, under Delaware corporate law.

83. 493 A.2d at 953–54.

tively well-intentioned, but nevertheless interested directors, will subconsciously be motivated by the profoundly negative effect a takeover could have on their personal bottom lines and careers.

■ Allowing such directors to use a broad substantive coercion defense without a serious examination of the legitimacy of that defense would undercut the purpose the *Unocal* standard of review was established to serve. For many of these reasons, Professors Gilson and Kraakman—from whom our courts adopted the term substantive coercion—emphasized the need for close judicial scrutiny of defensive measures supposedly adopted to address that threat:

> To support an allegation of substantive coercion, a meaningful proportionality test requires a coherent statement of management's expectations about the future value of the company. From the perspective of shareholders, substantive coercion is possible only if management plausibly expects to better the terms of a hostile offer—whether by bargaining with the offeror, by securing a competitive bid, or by managing the company better than the market expects. To make such a claim requires more than the standard statement that a target's board and its advisers believe the hostile offer to be "grossly inadequate." In particular, demonstrating the existence of a threat of substantive coercion requires a showing of how—and when—management expects a target's shareholders to do better.

\*    \*    \*    \*    \*    \*

The discipline imposed by requiring management to state clearly just *how* it intends to cause the price of the company's shares to increase is a critical check on knee-jerk resort to assertions that a hostile offer's price is inadequate. For example, if management believes that the price of a hostile offer is inadequate because the market undervalues the company[ ] ... an acceptable statement of the threat to shareholders would require management to describe the steps that it planned to correct the market's valuation.

\*    \*    \*    \*    \*    \*

[S]ubstantive coercion is a slippery concept. To note abstractly that management *might* know shareholder interests better than shareholders themselves do cannot be a basis for rubber-stamping management's pro forma claims in the face of market skepticism and the enormous opportunity losses that threaten target shareholders when hostile offers are defeated. Preclusive defensive tactics are gambles made on behalf of target shareholders by presumptively self-interested players. Although shareholders may win or lose in each transaction, they would almost certainly be better off on average if the gamble were never made in the absence of meaningful judicial review. By minimizing management's ability to further its self-interest in selecting its response to a hostile offer, an effective proportionality test can raise the odds that management resistance, when it does occur, will increase shareholder value.[84]

Nothing in *Unitrin* is intrinsically inconsistent with the approach articulated by Professors Gilson and Kraakman; however, one must acknowledge that *Unitrin* mandates that the court afford a reasonable degree of deference to a properly functioning board that identifies a threat and adopts proportionate defenses after a careful and good faith inquiry. With those preliminary thoughts in mind, I turn to an examination of the Supermajority Bylaw.

---

84.   Gilson & Kraakman, *Delaware's Intermedi-* *ate Standard,* 44 BUS. LAW at 268–69, 274.

### C. Application Of The Unocal Standard of Review: Does The Supermajority Bylaw Pass Muster?

■ When the board of a Delaware corporation acts to oppose or defend against a hostile bid for corporate control, a heightened standard of judicial review applies. In order for the board's defensive actions to survive this enhanced judicial scrutiny, the board must establish: (1) that it had reasonable grounds to believe that the hostile bid for control threatened corporate policy and effectiveness; and (2) that the defensive measures adopted were reasonable in relation to the threat posed.[85]

■ The "presence of a majority of outside, independent directors will materially enhance" a board's ability to meet this burden.[86] In this case, I have concluded that six of the nine members of the Shorewood board cannot be considered outside, independent directors. Therefore, the board's actions are entitled to less deference.

### 1. Has The Shorewood Board Established That It Reasonably And In Good Faith Perceived The Existence Of Legitimate Threats?

■ The first prong of Unocal requires the defendants to establish that the Shorewood board, "after a reasonable investigation, ... determined in good faith, that the [Chesapeake Tender Offer and Consent Solicitation] presented a threat ... that warranted a defensive response."[87] Although the defendants would have me focus almost entirely on their actions in December 1999 and January 2000, a reasoned analysis requires a consideration of all their relevant actions, starting principally with the November board meetings.

In examining this prong of Unocal, I will focus on the two major threats that the defendants have relied upon to justify the Supermajority Bylaw: (1) price inadequacy; and (2) the risk of stockholder confusion.[88]

Although no one will ever point to the Shorewood board's actions as a model of how to analyze an acquisition bid, I am persuaded that the board had sufficient, good faith reasons to conclude that both the $16.50 and $17.25 a share offers were inadequate from a price perspective. Both of these offers trailed Shorewood's one-year high and, according to information provided to the board by O'Donnell and unrebutted by Chesapeake, lagged the price at which comparable transactions had been effected in the specialty packaging industry. The price offered also

---

85. Unocal, 493 A.2d at 955; Unitrin, 651 A.2d at 1373; Mentor Graphics, 728 A.2d at 44–45.

86. Unitrin, 651 A.2d at 1375. Although this has been stated unequivocally as to the first prong of Unocal, it is less certain that the Supreme Court believes it to be relevant to the second prong. In my view, this factor is relevant to both factors because what a board does is as important as why a board claims it decided to do it. The absence or presence of an outside majority might be a factor leading a court to conclude that particular defensive options were selected in good or bad faith.

87. Unitrin, 651 A.2d at 1375.

88. The defendants also cite the risk that Chesapeake will be unable to consummate its offer because of 8 Del. C. § 203. This risk is a creation of defendants' litigation position and it will be dealt with substantively in this case. The risk has already been communicated to Shorewood stockholders by Shorewood and is far too insubstantial to buttress the Supermajority Bylaw. Moreover, the Ariel Agreement post-dated the 66 2/3% Supermajority Bylaw and thus could hardly have set the board on its current course.

trailed the values placed on the company's stock by independent analysts.

■ After listening to Kamsky and Fairley at trial, I am also convinced that they believed, in good faith, that neither offer was fair. The fact that the Shorewood board did not obtain independent financial advice until December is not dispositive. There is no legal requirement that a board consult outside advisors, so long as the board has adequate information to make an informed judgment.[89] Given the experience in the Shorewood board room on November 16 and November 18 and the board's focus on relevant value factors, the defendants have persuaded me that they made a reasoned judgment that the $16.50 offer was inadequate from a price perspective.

My conclusion is identical as to the later $17.25 per share Tender Offer. The board deliberated at two meetings before determining that this later offer was also inadequate. There was adequate information and expertise in the board room for the Shorewood board to make this judgment.

On the other hand, the defendants have not convinced me that the threat posed by Chesapeake's all-shares, all-cash Tender Offer was a particularly dangerous one.[90] The defendants must concede that there was nothing structurally coercive about Chesapeake's bid—for example, it was not in any sense a front-end loaded, two-tiered tender offer. At the time of the $17.25 Tender Offer, Shorewood also had in place a poison pill and had eliminated Chesapeake's ability to call a special stockhold-

ers' meeting. Thus Chesapeake was forced to present its Tender Offer indirectly, through the more deliberative consent solicitation process. Even after a successful consent solicitation, the Tender Offer could not go forward until a new Shorewood board was seated and redeemed the pill after proper deliberations.

In addition, Chesapeake had indicated that its Offer was negotiable and that it might be willing to pay more if Shorewood's negotiators could persuade Chesapeake that Shorewood had greater value. Chesapeake had also offered to discuss the structure of the transaction and its openness to engaging in another form of transaction (e.g., a stock deal) that might have more favorable tax advantages to Shorewood stockholders. Therefore, the Shorewood board had the option of taking Chesapeake up on these representations and influencing the level of its bid through negotiations.

Another factor requiring a characterization of the price inadequacy threat as mild is the board's failure to show that its current plans will generate a higher *realizable* value than $17.25 in the relatively near future. Having cloaked itself in the business strategy privilege, the Shorewood board has cut off any ability of the court to assess how inadequate the Chesapeake offer really is. Given that the Shorewood board is barring its stockholders access to a substantial premium, it is critical, therefore, that Shorewood's defenses be propor-

---

89. *Citron v. Steego Corp.*, Del.Ch., C.A. No 10171, mem. op. at 22–23, Allen, C., 1988 WL 94738 (Sept. 9, 1988); *Behrens v. United Investors Management Co.*, Del.Ch., C.A. No. 12876, mem. op. at 23, Allen, C., 1993 WL 400209 (Oct. 1, 1993).

90. *Interco*, 551 A.2d at 798 (mere price inadequacy of an all-cash, all-shares offer present-

ed a modest threat); *In re Unitrin Inc. Shareholders Litig.*, Del.Ch., C.A. Nos. 13656, 13699, mem. op. at 16, Chandler, V.C., 1994 WL 698483 (Oct. 13, 1994, rev. Oct. 14, 1994) (all-cash, all-shares offer that was inadequate but negotiable posed a "mild" threat), *rev'd on other grounds*, 651 A.2d 1361.

tionate to this modestly justified threat.[91]

I reach a different conclusion about whether the Shorewood board legitimately identified the second threat it relies upon: the risk of stockholder confusion. Though the defendants claim that this issue first came to the fore in November, there is no persuasive evidence that this is so. Rather, this threat appears to have emerged out of Shorewood's "A Team" of advisors in December. The evidence that the board actually—in its very brief November meetings—concentrated on whether stockholders would be unable to sort out the relevant issues after effective disclosures from management is not convincing.

The board has not come close to demonstrating that it identified this threat *at any time* "after a reasonable investigation" and "in good faith." The board seemed to have slighted, if not totally disregarded, key issues such as the facts that:

- institutional investors and management holders comprised over 80% of the Shorewood electorate;
- Shorewood was followed by analysts from several major brokerage houses that were regularly briefed by Shorewood management on the company's strategy and initiatives;
- Shorewood had disclosed information about all of the strategic issues that supposedly were not understood by the market;
- analysts had factored these issues into their reports on Shorewood's value;

- Shorewood's board had the opportunity to address the confusion issue through more complete and consistent disclosures to its stockholders; and
- Shorewood's management believed it had strong credibility on Wall Street and felt that it could communicate effectively about key corporate issues if given the time and resources.

Nor did the board conduct any sort of informal survey of its largest stockholders or the analyst community to see if they were befuddled by the Chesapeake Tender Offer. This would not have been difficult, given the fact that several analysts follow Shorewood and given the concentrated institutional investor holdings in Shorewood.

By the time the Shorewood board adopted the final Supermajority Bylaw on January 5, 2000, the confusion threat was even less of an issue. At that time, the board knew that less than 1% of Shorewood's shares had been tendered to Chesapeake; that analysts had continued to value Shorewood at a higher price than the Chesapeake offers even after those offers were on the table; and that the board had discussed all the issues the market could not understand in the company's own 14D–9.[92]

Moreover, the Shorewood board, per the Defensive Bylaws, controlled the record date of any consent solicitation. This gave the board ample opportunity to communicate its view of the company's true value and the inadequacy of the Chesapeake bid to the company's sophisticated shareholder

---

91. Gilson & Kraakman, *Delaware's Intermediate Standard*, 44 BUS. LAW at 268.

92. The defendants' reliance on *Shamrock Holdings, Inc. v. Polaroid Corp.*, Del.Ch., 559 A.2d 278 (1989) is misplaced. In that case, the court held that there was no way for the stockholders to place a value on a very sizable patent litigation claim for which Polaroid had won a liability judgment but was still litigating the damages. *Id.* at 289. The litigation claim was Polaroid's largest asset. *Id.* at 288. Polaroid could not disclose the value because that would have compromised its bargaining position. *Id.* at 290. There is no comparable, non-understandable and financially material issue involving Shorewood.

and analyst base.[93] For all these reasons, Shorewood seemed to be in an excellent position to win a vote on the merits, without additional procedural help.

Yet on the day it adopted the final Supermajority Bylaw, the board never assessed whether the supposed threat of confusion still existed. Indeed, it discussed no threats that day at all, relying on its prior determination of the threats posed by Chesapeake's offer.

On the basis of this record, the threat of confusion emerges more as a post hoc, litigation-inspired rationale for the previously adopted 66 2/3% Supermajority Bylaw than as a serious threat identified as a genuine concern by the board. The defendants have not persuaded me that they made an informed, good faith judgment that the Shorewood electorate would be confused about Shorewood's value and vote with Chesapeake as a result of confusion, rather than informed self-interest. Nor have they proven that such a threat of confusion actually exists.

Therefore, I conclude that the defendants have only met their burden on the first prong of *Unocal* as to the issue of price inadequacy.

### 2. Was The Supermajority Bylaw A Proportionate Response To The Threats Facing Shorewood?

■ The second prong of *Unocal* requires the defendants to establish that the Supermajority Bylaw was a proportionate response to the legitimate threats facing Shorewood. In this case, that means that the defendants must show that the Supermajority Bylaw was: (1) not preclusive; and (2) within the range of reasonable

defensive responses to Chesapeake's Tender Offer and Consent Solicitation.[94] I have already found that the Shorewood board did not satisfy its burden of showing that it identified the threat of "stockholder confusion" or of "substantive coercion" in a good faith and informed manner.

Nonetheless, I will test the Supermajority Bylaw against both the threat of price inadequacy (which was legitimately identified) and the "stockholder confusion threat" (which was not). There are two reasons for this approach. First, I am conscious that I am not the final word on any of the issues and therefore will endeavor to make a complete and reviewable record. Second, under *Unocal,* it putatively remains open to the defendants to demonstrate that the Supermajority Bylaw was "entirely fair" even though their threat analysis regarding confusion was inadequate.[95]

To meet their burden to show that the Supermajority Bylaw is not preclusive, the defendants must show, per *Unitrin,* that it is "realistically" attainable for Chesapeake to prevail in a consent solicitation to amend the Shorewood bylaws.[96] I read *Unitrin* as mandating that this court give some reasonable deference to the considered business judgment of a board in addressing this issue and that this court should not quibble around the margins if a board determined that a measure was reasonable after informed and good faith deliberations.

But I do not read *Unitrin* as a reformulation of *Unocal* 's focus on the actual substantive reasonableness of defensive measures and whether a board in fact made a

---

93. *Unitrin,* 651 A.2d at 1363 n. 33 (finding that it was relatively easy to communicate with a sophisticated stockholder base).

94. *Id.* at 1387–88.

95. *Id.* at 1377 n. 18.

96. *Id.* at 1389.

good faith and informed business judgment in adopting those measures.

In this case, the Shorewood board simply made no judgment at all whether it was "realistically" attainable for Chesapeake to amend the Shorewood bylaws in the face of either the 66 2/3% Supermajority Bylaw or the final 60% Supermajority Bylaw. The Shorewood board did not even discuss this issue.[97] An indication of how blind the Shorewood board was to the relevance of whether the Supermajority Bylaw was preclusive was its adoption of the 66 2/3% Supermajority Bylaw. Under that measure, it was "mathematically impossible"[98] for Chesapeake to prevail in a consent solicitation involving a 90% turnout, assuming that the Shorewood board followed its announced intention to oppose such a solicitation. Yet, the 66 2/3% Supermajority Bylaw was adopted and stayed in place until virtually the eve of trial.

At the time the board lowered the requirement to 60%, it again ignored whether Chesapeake could "realistically" attain the necessary votes to amend the Shorewood bylaws if the Shorewood board continued to oppose that endeavor.[99]

Not only that, the Shorewood board failed to consider a host of other relevant issues, including the historical turnout in Shorewood elections, the composition of the Shorewood electorate, and the self-interest of the management holders. The board's impoverished deliberations were only once supplemented by expertise, and that consisted of less than five minutes of input from Crozier of Innisfree, who opined without much preparation that 95% of the electorate would vote. Crozier appears to have been asked no questions and never was asked to advise whether an insurgent could realistically attain victory in the face of the Supermajority Bylaw.

Therefore, nothing in the Shorewood board's deliberations is sufficient to help them carry the day. Although post hoc analyses prepared for trial should be not able to buttress a board's *Unocal* showing in a situation where the board's own deliberations were grossly inadequate, the defendants nevertheless have the right to prove that the Supermajority Bylaw is nonetheless fair.[100]

I therefore turn to the defendants' trial evidence regarding preclusion, the most important of which was actually—believe it or not—presented by Chesapeake's own expert.

### a. The Battle Of The Proxy Solicitation Experts

#### i. The Defendants' Expert

The defendants' expert was Alan M. Miller, an experienced proxy solicitor who has published articles in the field and served as an expert in litigation on proxy contest issues. Miller is now one of the top managers at Innisfree, a proxy solicitation firm.

Miller's most relevant opinion is that voting turnout in the Chesapeake Consent Solicitation was likely to be at or slightly

---

97. There is some suggestion in Kamsky's deposition testimony that a lawyer advised the board about this issue. If so, I give no weight to this factor for several reasons. First, this advice has been concealed. Second, what expertise does a lawyer *qua* lawyer have on that subject? Finally, if a lawyer gave such non-legal advice about electoral behavior, invocation of the attorney-client privilege was improper.

98. *Unitrin,* 651 A.2d at 1389.

99. *Id.* at 1389.

100. Implicit in my finding is that the Shorewood board at breached its duty of care in adopting the Supermajority Bylaw on a grossly uninformed basis.

above 95%.[101] Miller summarized his conclusions—which underestimate management's voting power—on the following chart: [102]

SHOREWOOD PACKAGING CORPORATION
CONSENT SOLUCITATION - LIKELY PARTICIPATION

| TYPE OF HOLDER | SHARES CONTROLLED AS A % OF OUTSTANDING | % PARTICIPATING | SHARES PARTICIPATING AS A % OF OUTSTANDING |
|---|---|---|---|
| CHESAPEAKE / ARIEL | 20.54% | 100% | 20.54% |
| ARBITRAGE | 7.44% | 100% | 7.44% |
| INSTITUTIONAL INVESTORS | 41.33% | 95% | 39.26% |
| RETAIL SHARES HELD IN BANK NAME | 0.05% | 90% | 0.05% |
| RETAIL SHARES HELD IN BROKER NAME | 5.55% | 65% | 3.61% |
| RETAIL SHARES HELD DIRECTLY BY INDIVIOUALS | 3.74% | 90% | 3.37% |
| OFFICERS & DIRECTORS | 21.34% | 100% | 21.34% |
|  | 100% |  | 95.61% |

In reaching his 95% estimate, Miller admitted that he had no experience with Shorewood elections in the past and gave no weight to past voting experience at the company. Instead, he built his analysis on his experience with other companies and the fact that the Consent Solicitation was a major economic issue for stockholders. In these situations, Miller says that stockholders will vote in high numbers because of the importance of the issues at stake.

Miller explained his rationale for each category as follows:

- *Institutional investors:* Miller justified his assumption that they would vote at a 95% rate on the grounds that they have fiduciary obligations to vote, have the financial incentive to vote and the wherewithal to vote, and have typically voted at a high rate in high-stakes corporate contests.
- *Retail shares in bank name:* Miller said that his 90% estimate was based on past experience with that category and the fact that proxy solicitors would be pounding on the banks to vote.
- *Retail Shares in broker name:* Miller testified that the 65% level he estimated was typical and could be expected given the importance of the issues at stake and the voter mobilization efforts of the parties.
- *Retail shares held by individuals:* The 90% assumption was justified by experience, the importance of the issues, and voter mobilization efforts.

Miller attempted to bolster his overall showing by presenting a chart of tender offers involving clients of the proxy solicitation firm of D.F. King in 1999—the same firm for which Chesapeake's expert works. The chart showed that 95% of the shares were tendered in over half of the 39 deals mentioned. Miller opined that the tender offer context was analogous to the Chesapeake Consent Solicitation because in both cases the stockholders' money is at stake.

For reasons that are also true with respect to analyzing the presentation of

101. Miller also testified that Supermajority Bylaw would not prevent Chesapeake "from conducting a full and fair consent solicitation." Tr. at 648. This opinion is so vague as to be meaningless.

102. DX 35.

Chesapeake's expert, it is difficult for me to rely with any precision on Miller's opinion. Neither Miller nor his Chesapeake counterpart, John Cornwell from D.F. King, burdened me with literature from the field, or actual empirical evidence of voting behavior by categorical groups or of overall turnout rates in the consent solicitation context. Whether I could have admitted their testimony as reliable if objections had been made is quite doubtful, given the searching scrutiny required of the foundations for expert testimony.[103]

Principally, Miller and Cornwell ask me to rely on their experience and practical explanations for their conclusions. In expedited proceedings like these, where the court's own ability to independently research the relevant literature is quite limited, this makes it particularly hard to determine which, if either, expert is closer to the mark.

For several reasons, however, I find Miller's opinion about turnout to be at the very highest range of possible outcomes. First, the tender offer chart he presented in support of his position provides no reliable basis for his opinion as to the turnout in a contested consent solicitation. Putting aside the fact that a tender offer involves a direct tender in exchange for consideration, Miller also ignored the fact that all of the transactions on the chart were consensual transactions supported by the company's management pursuant to an executed merger agreement and that in several of the deals the acquiror had locked up a majority in advance of the solicitation.

Second, Miller was unable to say how much lower than 95% turnout could be, based on his experience. Third, Miller's inability to make such an estimate was rendered more troubling by his further inability to cite any consent solicitation involving a public company in which a 95% turnout had been achieved. In his deposition, Miller characterized a turnout at the 95% level as "extraordinarily high." [104]

Third, Miller did not lower his turnout estimates due to the decision by the Shorewood board not to order a so-called "NOBO" list, which is a list of non-objecting beneficial owners. Without such a list, an effective solicitation of those holders cannot take place, thus undermining Miller's reliance on the voter mobilization efforts of the parties to pump up turnout. *Only the Shorewood board can order such a list.*

Finally, Miller gave materially different estimates of categorical turnouts in 1993 when he was advising the management of a large company seeking to acquire a target in a fight with another acquiror.[105] In that situation, management needed to get a two-thirds majority of its outstanding shares to support the acquisition. At that time, Miller opined that institutions would vote at a 90%, not 95%, level; that banks would vote at an 85%, not 90%, level; and that brokers would vote at a 50%, not 65%, level.

---

**103.** *See M.G. Bancorporation, Inc. v. Le Beau,* Del.Supr., 737 A.2d 513, 521 (1999) (Delaware Rule of Evidence 702 is "identical to its federal counterpart," which "imposes a special obligation on the trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable' ") (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**104.** Miller Dep. at 23.

**105.** *See* PX 109.

The defendants contend that the current circumstances are different because that prior situation involved a three-party contest for control in which many stockholders owned shares in each company and because turnout generally has increased during the late 1990s. Even so, the prior situation appears to have been a high-stakes contest for control where management had ordered a NOBO list and was asking for votes—factors Miller admits generally increase turnout. Moreover, there appear to have been large voter mobilization efforts and similar categories of voting. In his prior representation, Miller also lumped arbitrageurs in with the broker category,[106] whereas with Shorewood he has broken that category out and assumed a 100% turnout, a move that one would think would correspondingly decrease, not increase, his projected vote for the broker category at Shorewood. Moreover, Miller described his turnout assumptions at that time as *maximal.*

Assuming that Miller's current assumptions are adjusted to be consistent with his previous assumptions and that the percentage of arbitrageurs is, say, 95%, because of record date issues and their high-turnover sales practices, Miller's projections drop to 92%. If the Shorewood board's decision not to order a NOBO list is considered in this comparison, Miller's projections should be deflated even further.

For all these reasons, Miller has failed to persuade me that turnout is likely to be at the 95% level. While such a turnout is possible, it seems more likely that turnout will be at a lower, although still sizable, level.

### ii. Chesapeake's Expert

Like Miller, Chesapeake's expert John W. Cornwell is an experienced proxy solicitor who has written articles and served as an expert witness in the field. Cornwell is now an Executive Vice President at the proxy solicitation firm of D.F. King.

Cornwell gave two major opinions at trial. First, he estimated that the maximum turnout that could be expected in the Consent Solicitation was 88%. Second, he estimated the maximum possible vote Chesapeake could obtain in the Consent Solicitation if Shorewood insiders continued to oppose the Solicitation.

As to the former estimate, Cornwell's assumptions are largely consistent with the advice Miller gave a non-litigation client in 1993. While Cornwell believes his assumptions are aggressive, his opinion generally supports the view that a turnout in the 88%–90% range is conceivable.

As to the latter issue, Cornwell finds himself in a more awkward position. At his deposition—which was done before the 66 2/3% Supermajority Bylaw gave way to the 60% Supermajority Bylaw—Cornwell testified that the maximum vote Chesapeake could obtain was 61.5%. At trial, Cornwell revised his estimate to 59.77%, a number insufficient to satisfy the downwardly revised 60% Supermajority Bylaw.

---

**106.** Miller previously lumped hedge funds into the broker category, whereas in this case he has created a separate category for arbitrageurs from which he expects a 100% turnout. By "hedge fund," Miller seemed to be referring to stockholders who had bought short-term positions because the company was in play. That is, he seemed to be referring to arbitrageurs. Lumping these stockholders together with brokers should have increased turnout, given his view of arbitrageur voting behavior.

The defendants, as one would expect, claim that this revision was not inadvertent and was based not on reputable adjustments due to new information, but on the need to justify Chesapeake's litigation position. Into this morass, I must now venture.

Cornwell's original analysis, which was done by hand, assumed only five major categories of Shorewood stockholders. Cornwell then estimated the maximum turnout for each category and the maximum vote Chesapeake could obtain from each category. The basic assumptions are as set forth below.[107]

| Category | % Voting | % For Chesapeake |
|---|---|---|
| Officers and Directors | 100% | 0% |
| Chesapeake | 100% | 100% |
| Institutions | 90% | 90% |
| Brokers | 60% | 75% |
| Individuals | 90% | 50% |

Based on this analysis, Cornwell estimated a maximum turnout of 90% and a maximum affirmative vote of 61.5%.

Cornwell's later analysis is much more detailed and states as follows: [108]

### CHESAPEAKE v. SHOREWOOD
Shareholder Vote Analysis
Best Case Scenario

| Category | Shares Held | % Voting | Shares Voting | % "FOR" | Shares "FOR" |
|---|---|---|---|---|---|
| O & D | 5,834,429 | 100% | 5,834,429 | 0% | – |
| Chesapeake | 4,106,440 | 100% | 4,106,440 | 100% | 4,106,440 |
| Domestic Banks | 11,848,090 | 90% | 10,663,281 | 90% | 9,596,953 |
| Foreign Banks | 865,086 | 20% | 173,017 | 20% | 34,603 |
| Domestic Brokers | 2,564,521 | 60% | 1,538,713 | 75% | 1,154,034 |
| Foreign Brokers | 243,998 | 10% | 24,400 | 75% | 18,300 |
| Shore Family | 26,054 | 100% | 26,054 | 0% | – |
| Employees | 24,946 | 100% | 24,948 | 0% | – |
| Individuals | 468,458 | 90% | 421,612 | 50% | 210,806 |
| ARBS | 1,356,316 | 90% | 1,220,684 | 100% | 1,220,684 |
| TOTALS | 27,338,338 | 87.9% | 24,033,676 | | 16,341,820 * |

\* 59.77 % of outstanding

Note: Excluding O & D and Chesapeake, shares "FOR" represent 86,8% of all shares voted

Cornwell explained the major reason for the differences at trial. He received much more detailed information about the Shorewood stockholder base after his deposition and this enabled him to prepare a more precise opinion.

Although the defendants claim that Cornwell's entire revised analysis was obviously a pretext to reach a pre-conceived conclusion, I am not prepared to find that to be the case, because Cornwell gave well-reasoned explanations for all the choices made in his revised analysis. There are legitimate grounds to question some of those choices, but I see no reason to question Cornwell's integrity.

The defendants raise three substantive challenges to Cornwell's revised analysis.

107. JX 25.

108. PX 86.

The initial one is that Cornwell moved 1.1 million shares into two new categories: foreign banks and foreign brokers. Because these categories vote in much lower proportions and are much more likely to vote with management than an insurgent, this move had the effect of reducing Cornwell's projected turnout and his projected maximum Chesapeake vote. The rationale for Cornwell's choice was that, as a result of updated information, he found that there were 1.1 million Shorewood shares held by stockholders with no recognizable United States zip code, no zip code at all, with a military address, or a foreign address. Cornwell reasoned that these were shares likely to be held by foreign banks and brokers. He allocated shares to those categories by assuming the same proportionate split for foreign banks and brokers as existed for domestic banks and brokers in Shorewood's stockholder list.

Miller filed a reply affidavit at my invitation addressing this rationale. In his affidavit, Miller claims that this category most likely is dominated by domestic banks. He ascribes their lack of a domestic address to: (i) duplicate stock holdings where institutional investors hold and vote shares owned by their clients and their clients have given instructions not to mail; (ii) short stock holdings with no voting rights, where the underlying shares are properly voted by a third party; (iii) stockholders who have given non-standard delivery instructions, such as a Federal Express address; and (iv) accounts listed with an offshore address, but voted by United States institutions. Miller concedes that foreign holders are in this category as well but opines that their numbers are small. On the basis of Miller's view that most of the stockholders in the category with unknown, military, or foreign addresses are domestic institutions, the defendants argue that all 1.1 million shares in that category should be moved back into the category of domestic banks, producing another 845,455 possible affirmative votes for Chesapeake (or a 3.1% increase).

To be honest, I have no rational way to resolve this question. Neither side has presented reliable literature on these subjects. Each of the experts has simply given me their judgment based on experience. That being said, I think Cornwell has the better of the argument. Given that it will be much more difficult to communicate with these stockholders given their overseas or incomplete addresses, the absence of a NOBO list to facilitate such communication, the fact that most of the domestic institutions appear to actually have addresses, and the absence of any reliable basis (other than Miller's say-so) for assuming that all of these shares should be placed back in the domestic institutions category, I am unprepared to say that Cornwell's approach is invalid. It is counterintuitive to project a high voter turnout among stockholders who are either abroad or who have unreliable mailing addresses. At best, therefore, a modest adjustment to Cornwell's analysis is in order that might increase Chesapeake's maximum vote by, say, 1%.

The defendants next quibble is with Cornwell's attribution of a 90% turnout rate for arbitrageur shares. Cornwell testified that the reason for this is that arbitrageurs are not in the business to vote; they are in the business to make money. Although he felt that all of the arbitrageurs who voted would likely do so for Chesapeake, Cornwell pointed out that arbitrators move in and out of their holdings quickly. This means that the arbitrators who own Shorewood shares as of the record date might not hold them when it came time to vote. This reasoning seemed sensible to me, and the defendants' only real response is to claim that Cornwell testified differently at his deposition. Al-

though they have a legitimate basis for arguing this point, Cornwell testified that he was referring in his deposition to the fact that of the arbitrageurs who would vote, 100% were likely to favor Chesapeake. I find this explanation credible. Moreover, it is hard to imagine that 100% of the arbitrageur category would actually vote, in view of their trading patterns. Therefore, the defendants' argument that Cornwell's projected maximum vote should be increased by 135,632 shares, or 0.5%, seems to me to be strained. A voting rate of 95% might be achievable, however, and would add a mere 0.25% to Chesapeake's possible vote.

Finally, the defendants claim that the Non–Purchased Ariel Shares must be taken out of the domestic institutions category and assumed to vote at a 100% level for Chesapeake. This would add another 1.05% of the vote to Cornwell's maximum. The basis for that is that there is virtually no doubt that Ariel will vote. The problem I have with this suggestion is that there is no reason why this rationale does not apply to other holders in the domestic bank category. Certainly, the overwhelming likelihood that Ariel would vote should play into the overall voting rate for the domestic bank category, but why is not that true of other institutions? When Miller estimated that 90% of the institutions would vote in his representation of a corporate client in 1993, he must have known that some of the institutions in that category always voted. In sum, the defendants have given me no reason why the exclusion of Ariel from the domestic bank category would not have to be accompanied by an overall reduction in the voting rate Cornwell assumed for the rest of that category.

Most important, the defendants' adjustments—which bring Cornwell's maximum vote for Chesapeake to 64.41% if I accept, as I do not, all of their proposals—fails to account for the fact that Cornwell does not believe his projected maximum to be realistically attainable, anyway. Though the defendants have attempted to twist his testimony, Cornwell testified that his *maximum* vote analysis was, if anything, on the high side. In his professional opinion, he believes that the turnout and affirmative votes for Chesapeake in each category are much more likely to be markedly lower. Furthermore, Cornwell's assumption that the turnout will be closer to 90% than 95% strikes me as more realistic and consistent with Miller's own prior views.[109]

At most, the defendants can use Cornwell's analysis to demonstrate that it is theoretically possible for Chesapeake, given ideal circumstances, to meet the 60% threshold. But no real-world evidence supports the view that such ideal circumstances have ever come to pass for an insurgent in Chesapeake's position facing the concerted opposition of management holders controlling over 20% of the vote.

Indeed, the defendants' expert Miller was unable to identify, despite his twenty-one years in the business, any situation where an insurgent had been able to obtain a 60% supermajority when opposed by a 20–24% management block. In Miller's previous representation of a corporate client, Miller opined that his client—which was seeking votes from its own stockholders and needed two-thirds support—could likely only obtain a vote of 58.1% in an uncontested solicitation, and less than that in a disputed context.

---

**109.** *See Unitrin,* 651 A.2d at 1382–83 (assuming a 90% turnout in a contested election involving a high concentration of institutional investors); *Robert M. Bass Group, Inc. v. Ev-* ans, Del.Ch., 552 A.2d 1227, 1244 (1988) (crediting testimony that 80–83% of eligible shares tend to vote in contested matters).

Therefore, my read of the expert evidence supports the inference that victory is not realistically attainable for Chesapeake in the face of the Supermajority Bylaw.

b. *The Huge Margin Chesapeake Must Obtain To Prevail Also Supports The Conclusion That The Supermajority Bylaw Is Preclusive*

The Shorewood board claims that it chose 60% as the threshold for the ultimate Supermajority Bylaw because that would enable a majority of the disinterested stockholders to decide whether the bylaws should be amended. This rationale, however, is not fulfilled by the Supermajority Bylaw.

The most fundamental flaw in the board's reasoning is the disparate treatment the board gave their own self-interest and that of Chesapeake and Ariel. Even though Marc Shore makes millions of dollars from his managerial position and has his personal debts covered by the company, the board has assumed that he will vote as a "disinterested stockholder." Why? Simply because he told his fellow board members that he would sell at the right price and they believed him. The board did no analysis of what level of post-tax return Shore would need to generate to provide him with financial support equal to what he receives from Shorewood now.[110] The same is true for the other management holders. The board also ignored the fact that each one of its members had already committed to oppose the Consent Solicitation, thus rendering their votes out of Chesapeake's reach.

In contrast, the board was willing to deem Ariel "interested" because of its arrangement with Chesapeake over the Purchased Shares *even though Ariel was a decade-long holder of Shorewood shares and could not be labeled a short-term speculator.*[111] Similarly, the board deemed Chesapeake to be tainted by its motives as an acquiror.

From this logic, the board reached the conclusion that Chesapeake should have to get 60% of the vote to prevail. In reality, however, the assumptions underlying the board's decision are flawed. If one assumes, as I do, that the management holders are not disinterested and will stick with their announced opposition to the Chesapeake Consent Solicitation, Chesapeake has to get the following percentages to prevail, under extremely optimistic turnout assumptions:

---

110. The economic analysis that the defendants claim proves that Ariel's voting behavior is influenced by the Ariel Agreement also proves that the perquisites of Shore and other directors would influence their voting behavior. The defendants' economic expert candidly admitted as much. Tr. 855–57.

111. As noted previously, the board based its judgment on an erroneous view of Ariel's incentives under the Agreement.

| PERCENTAGE OF PARTICIPATING DISINTERESTED SHARES CHESAPEAKE MUST WIN TO PREVAIL (Excluding Chesapeake Block And Shorewood Insiders) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 88%Turnout Rate | | 90%Turnout Rate | | 92.5% Turnout Rate | | 95% Turnout Rate |
| Total Outstanding Shares | 100 % | | 100 % | | 100 % | | 100 % |
| Less Non-Participating Shares | (12) % | | (10) % | | (7.5) % | | (5) % |
| Remaining Shares Available | 88 % | | 90 % | | 92.5 % | | 95 % |
| Less Shares Held By Committed Blocks | (38.78) % | | (38.78) % | | (38.78) % | | (38.78) % |
| • Shares Held By Chesapeake Block | | [14.9 %] | | [14.9 %] | | [14.9 %] | [14.9 %] |
| • Shares Held by Shorewood Insiders | | [23.88 %] | | [23.88 %] | | [23.88 %] | [23.88 %] |
| Total Participating And Disinterested Shares | 49.22 % | | 51.22 % | | 53.72 % | | 56.22% |
| Participating And Disinterested Shares Chesapeake Must Win To Prevail 60% - 14.9 = 45.10% | 45.10 % | | 45.10% | | 45.10 % | | 45.10% |
| Percentage of Participating, Disinterested Shares Chesapeake Must Win To Prevail | 91.63 % | | 88.05 % | | 83.95% | | 80.22 % |

Even assuming that Ariel's Non–Purchased Shares should be lumped together with Chesapeake's 14.9% block, the percentages Chesapeake has to obtain are extremely high:

| PERCENTAGE OF PARTICIPATING DISINTERESTED SHARES CHESAPEAKE MUST WIN TO PREVAIL (Excluding Chesapeake/Ariel Block And Shorewood Insiders And Assuming Ariel Votes Its Non-Purchased Shares With Chesapeake) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 88%Turnout Rate | | 90%Turnout Rate | | 92.5% Turnout Rate | | 95% Turnout Rate |
| Total Outstanding Shares | 100 % | | 100 % | | 100 % | | 100 % |
| Less Non-Participating Shares | (12) % | | (10) % | | (7.5) % | | (5) % |
| Remaining Shares Available | 88 % | | 90 % | | 92.5 % | | 95 % |
| Less Shares Held By Committed Blocks | (44.42) % | | (44.42) % | | (44.42) % | | (44.42) % |
| • Shares Held By Chesapeake/Ariel Block | | [20.54 %] | | [20.54 %] | | [20.54 %] | [20.54 %] |
| • Shares Held by Shorewood Insiders | | [23.88 %] | | [23.88 %] | | [23.88 %] | [23.88 %] |
| Total Participating And Disinterested Shares | 43.58 % | | 45.58 % | | 48.08 % | | 50.58 % |
| Participating And Disinterested Shares Chesapeake Must Win To Prevail 60% - 20.54 = 39.46% | 39.46% | | 39.46% | | 39.46 % | | 39.46% |
| Percentage of Participating, Disinterested Shares Chesapeake Must Win To Prevail | 90.55 % | | 86.57 % | | 82.07 % | | 78.02 % |

In either scenario, the Supermajority Bylaw requires Chesapeake to obtain far higher than a majority—or 60% or 66 2/3%—of the disinterested votes. The required disinterested majorities are more commonly associated with sham elections in dictatorships than contested elections in genuine republics. While I recognize that the board wanted a "focused consensus" of disinterested stockholders to decide key issues, they set the required majority at an unattainably high level.

The defendants have presented no reliable evidence to suggest that Chesapeake or any other insurgent could achieve such a high level of support in the face of management opposition. Thus they have failed to demonstrate that the Supermajority Bylaw is non-preclusive.

### c. The Supermajority Bylaw Is Not Within The Range Of Reasonable Responses

■ Even if the Supermajority Bylaw was not preclusive, the board has not met its burden to show that it was a proportionate response to the threat posed by Chesapeake. The Supreme Court has instructed this court to consider this issue in light of whether the defensive measure at issue "is a statutorily authorized form of business decision which a board of directors may routinely make in a non-takeover context" and is "limited and corre-

sponded in degree or magnitude to the degree or magnitude of the threat . . . ." [112]

Both questions must be answered in the negative. As to the first, I do not reach Chesapeake's argument that a board of directors may not, by bylaw, require a supermajority vote to amend the bylaws.[113] But I agree with Chesapeake's contention that a board decision to adopt a supermajority bylaw is not one "routinely" made in the "non-takeover" context. Rather, such bylaws are almost always a method of minimizing the ability of stockholders to interfere with the board's control or management of the company.[114]

The more important proportionality problem is the fact that the Supermajority Bylaw is an extremely aggressive and overreaching response to a very mild threat. The board already had a poison pill in place that gave it breathing room and precluded the Tender Offer. The Defensive Bylaws had eliminated Chesapeake's ability to call a special meeting, at which a majority of a quorum could act. This forced Chesapeake to proceed through the slower route of a consent solicitation with the minimum support of a majority of the outstanding shares. The Shorewood board controlled, per the Defensive Bylaws, the record date. This guaranteed adequate time for communications and counter-solicitation efforts, as well as for the board to develop and consider strategic alternatives.

Given these factors, the board could have addressed the threat at hand through an aggressive communications plan.[115] The board could have also taken Chesapeake up on its offer to negotiate price and structure, if the board truly believed that price inadequacy was the problem. It never considered these less extreme and more proportionate options.

Instead, the board adopted a Supermajority Bylaw that can only be surmounted by obtaining over 88% of the disinterested votes, assuming a 90% turnout. Yet the board has been unable to demonstrate that such an outcome can be achieved. Ironically, its primary argument in that regard is that Shorewood's stockholder base is overwhelmingly comprised of sophisticated and highly mobilized stockholders who will turn out in droves. These, of course, are the very same stockholders who are, the defendants say, unable to sort out the issues and make a rational judgment for themselves.

Finally, the board did not even achieve its desired objective of vesting control in a majority of the disinterested shares. It most likely vested control of the vote in 88% of the disinterested shares. This is pretty wide of the target at which the board aimed. Even crediting that the

112.  *Unitrin,* 651 A.2d at 1389.

113.  Because I conclude that the Supermajority Bylaw is invalid on other grounds, I see no reason to reach Chesapeake's argument, which raises a novel and important issue of Delaware corporation law. *But see* 8 *Del. C.* § 216.

114.  The cases the defendants cite as implicitly recognizing the validity of supermajority bylaws support this conclusion. *E.g., Frankino v. Gleason,* Del.Ch., C.A. No. 17399, mem. op., Chandler, C., 1999 WL 1032773 (Nov. 5, 1999) (fight by incumbents to retain control by reliance on a bylaw requiring an 80% vote to amend bylaws affecting the board of directors), *aff'd sub. nom., McNamara v. Frankino,* Del.Supr., No. 534, Holland, J., 1999 WL 1319365 (Dec. 9, 1999); *USACafes v. Office,* Del.Ch., C.A. No. 8186, lett. op., Berger, V.C., 1985 WL 44685 (Oct. 28, 1985) (75% supermajority vote requirement to increase board adopted in face of a control threat).

115.  *Blasius,* 564 A.2d at 663 (board could not justify electoral manipulation by risk of stockholder voting errors where "it had time . . . to *inform the shareholders of its views on the merits of the proposal subject to stockholder vote"*).

board thought that more than a bare majority of disinterested stockholders should decide the question, the board could have selected a level within the realm of reason understandable by citizens of a republican democracy.

### d. This Conclusion Is Not At Odds With Unitrin

While I cannot deny that there is some tension between some of my analysis and the reasoning of *Unitrin*, my ultimate conclusion can be reconciled with that decision for several reasons.

First, the Supermajority Bylaw sets a much higher barrier than the repurchase program at issue in *Unitrin*. Assuming a 90% turnout, the percentage of disinterested votes that Chesapeake must receive to amend the bylaws is far higher than had to be obtained by American General to change the board in *Unitrin*:

| Unitrin | Shorewood |
|---------|-----------|
| 64.12% | 88.05% |

The defendants have presented no reliable evidence to suggest that the required percentage is "realistically" attainable.[116] Under *Unitrin*, therefore, the Supermajority Bylaw must be considered preclusive.

Next, the substantive coercion rationale cannot be wielded as imprecisely by the Shorewood board as was done by the defendants in *Unitrin* because the facts do not bear that rationale out in this case. Here, the early returns in the field suggest very little risk of voter confusion. Moreover, the defendants' own testimony about the company's sophisticated stockholder and analyst base and about Shorewood management's credibility with that base, as well as the defendants' arguments about their stockholders' likely voting behavior, undercut the need for any defense so extreme as the Supermajority Bylaw.

Another critical distinction is the difference between the self-interest of the management holders in *Unitrin* and those in this case. In *Unitrin*, the directors had no material financial interests in the company other than as stockholders.[117] Thus the Unitrin directors had no financial incentive to vote their shares simply to remain as directors. The opposite is true here, as six of the nine Shorewood directors have substantial monetary reasons to vote to keep themselves in control. Indeed, they have already announced their intention to oppose Chesapeake.[118]

Finally, the level of attention the Shorewood board paid to the relevant issues was grossly insufficient. *Unitrin* emphasized the need for deference to boards that make reasoned judgments about defensive measures. It in no way suggests that the court ought to sanction a board's adoption of very aggressive defensive measures when that board has given little or no consideration to relevant factors and less preclusive alternatives.

### D. The Blasius "Compelling Justification" Standard Applies, And The Defendants Cannot Satisfy It

■ The Shorewood board adopted the Supermajority Bylaw as a way of reducing

---

116. *Unitrin*, 651 A.2d at 1389.

117. *Id.* at 1368.

118. The *Unitrin* premise that outside directors will vote as stockholders to remove themselves, *see* 651 A.2d at 1380–81, is, upon close examination, a bit of a straw man. If outside directors who control a board believe that an acquisition offer is favorable, they will not, in all likelihood, help consummate that offer by voting to remove themselves from office. Instead, they will redeem the rights plan and allow the tender offer to be presented. It is only when the board opposes a tender offer that a consent solicitation is likely to occur. In that circumstance, a presumption of disinterest is strained because it involves an outside director's willingness to vote against himself.

the voting power of Chesapeake and Ariel. It reached a determination about the 60% threshold by subtracting out the shares held by Chesapeake and Ariel from the denominator. By doing so, it treated those votes as less equal than others and acted to impede Chesapeake's voting power.[119]

The primary purpose for this action was to impair Chesapeake's ability to win the Consent Solicitation by increasing the required majority Chesapeake needed to obtain to preclusive levels.[120] Compounding this intentional impairment of the franchise was the defendants' decision to apply a very different standard to their own self-interest than they did to that of Chesapeake and Ariel.

The fact that the defendants originally raised the bar to a level where it was mathematically impossible for Chesapeake to win, assuming a 90% turnout, is also strong evidence of the defendants' intent to preclude any consent solicitation by Chesapeake that would threaten their control. So is their failure to consider whether Chesapeake had a reasonable chance to succeed under the ultimate 60% Supermajority Bylaw.

■ Hence, I conclude that the defendants clearly acted to "interfere with or impede ... [the exercise of] the sharehold-

er franchise."[121] Therefore, the compelling justification standard applies. The mild threat posed to Shorewood by Chesapeake's all-shares, all-cash Tender Offer and supporting Consent Solicitation does not provide a compelling justification for the Bylaw. The defendants' belief that—because of their superior access to company information—they "know[ ] better than ... the stockholders" about "who should comprise the board of directors" provides no legitimate justification at all.[122] As a result, the Supermajority Bylaw is invalid under the *Blasius* standard.[123]

## VI. *Can The Shorewood Stockholders Seat A New Board After They Have Validly Eliminated The Company's Classified Board Structure?*

■ The defendants argue that they have a vested right to serve out the remainder of their terms, even if their constituents, the Shorewood stockholders, decide to eliminate the company's classified board structure. The defendants base their assertion on 8 *Del. C.* § 141(k), which states that unless a company's certificate of incorporation "otherwise provides," a director of a "corporation whose board is classified" may not be removed without cause. The Shorewood certificate does not "otherwise provide" for such removal.

---

119. *Blasius,* 564 A.2d at 661 (where "primary purpose" is "impeding the exercise of stockholder voting power," a compelling justification is required).

120. *E.g.,* A. Shore Dep. I at 146 (board feared removal through an amendment to bylaws); Liebman Dep. I at 209 ("[W]hether in fact we could lose a consent solicitation without the amendment was in fact a question in the mind of the directors, absolutely.").

121. *Williams v. Geier,* 671 A.2d at 1376.

122. *Blasius,* 564 A.2d at 662–63.

123. I see no reason to reach, but do not reject, Chesapeake's argument that the Super-

majority Bylaw is also invalid under *Schnell v. Chris–Craft,* 285 A.2d at 439. There is ample evidence of entrenchment motives on the part of Shorewood's management. The failure of key players such as Marc Shore to explain their own actions to the court, coupled with the hasty and uninformed manner in which the Shorewood board adopted the obviously preclusive 66 2/3% Supermajority Bylaw, are but a couple of the many reasons to conclude that many of the Shorewood directors were out to protect their lucrative offices, rather than the Shorewood stockholders.

For the following reasons, I find this argument unconvincing.

First, the argument ignores the plain language of § 141(k), which provides protection to the directors of a "corporation whose board is classified." By the clear authority of 8 *Del. C.* § 109, the Shorewood stockholders have the power to amend the company's bylaws to eliminate a classified board structure. As soon as that validly happens, the Shorewood directors will no longer serve as directors of a "corporation whose board is classified." [124] They will at that time be removable without cause. [125]

Second, a plain reading of § 141(k) is the one most consistent with protection of the stockholders' right to determine the board structure by which they wish their corporation to be governed. Section 141(d) of Title 8 makes clear that this is an area of corporate policy properly within the province of the stockholders. [126] If this court were to adopt the defendants' argument, the ability of the stockholders of a Delaware company to implement a governance structure more immediately responsive to their will would be greatly frustrated. The stockholders would essentially be stuck with the moribund structure for a few years or until enough board support exists for a certificate amendment to be a viable option. There is no language in § 141 that would support the proposition that the General Assembly wished to limit the ability of stockholders to determine and immediately implement such a fundamental governance change pursuant to § 109.

Third, such an interpretation of the statute works no unfairness upon corporate directors as individuals. "[U]nder 8 *Del. C.* § 109 ..., all directors are on notice that ... bylaws [providing for a classified board can] be amended by the shareholders ...." [127] This is particularly so in the case of the Shorewood directors. Before the defendants implemented the Defensive Bylaws—that is, before late November 1999—the Shorewood bylaws explicitly provided that "any or all of the directors may be removed (with or without cause by a vote of the holders of a majority of the shares of stock then entitled to vote at an election of directors[ ] )." [128] Since Shorewood went public, it has represented to its shareholders that the company's directors could be removed by the stockholders

**124.** The fact that there are other statutory routes to eliminating a classified board or that could lead to the ultimate removal of a director in a classified position is, of course, irrelevant. *See, e.g., Orzeck v. Englehart,* Del. Supr., 195 A.2d 375, 378 (1963) ("the general theory of the Delaware General Corporation Law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same result might be obtained by different means").

**125.** In some ways this case is analogous to the case of *Frankino v. Gleason,* Del.Ch., C.A. No. 17399, mem. op. In that case, a bylaw required an 80% vote to amend Article III of the bylaws, which governed, among other things, board size. *Id.* at 1. The bylaws did not state, however, that a supermajority vote was required to amend the bylaw requiring the 80% vote. *Id.* By majority vote, that bylaw was amended to eliminate the 80% vote requirement. *Id.* at 4. Thereafter, by majority vote, the bylaws were amended to increase the size of the board. *Id.* This court held that these amendments were valid, and the Supreme Court affirmed. *Id.* at 12.

**126.** That statute provides that a classified board structure can only be established by initial bylaw, the certificate of incorporation, or a bylaw adopted by a vote of the stockholders. 8 *Del. C.* § 141(d).

**127.** *Roven v. Cotter,* Del.Ch., 547 A.2d 603, 608 (1988).

**128.** PX 63, at 10.

without cause. Thus the defendants' current view that they have vested rights in serving out their terms is at odds with what they led their own investors to believe and emerges only in the context of their struggle to retain their own control.

Fourth, my interpretation does not render a director serving on a board classified by bylaw with no protection from removal without cause. So long as the board is classified, § 141(k) protects particular directors from being singled out and removed from the board without cause—unless the company's certificate otherwise provides.

Finally, had the Shorewood board wished to provide itself with greater security it could have asked the Shorewood stockholders to elevate the company's classified board structure to the constitutional level of a charter provision. This exercise in *shared decision making with the stockholders* would have protected the board from a bylaw amendment eliminating the classified board structure. Never having gone to this trouble, the Shorewood board is not in a graceful position to claim that the owners of the corporation should be precluded from reorganizing the company's governance structure.

For all these reasons, I deny the defendants' counterclaim seeking a declaration that Chesapeake cannot accomplish what it seeks by way of its Consent Solicitation.

### VII. *Is Chesapeake An "Interested Stockholder" Under 8 Del. C. § 203?*

The defendants contend that Chesapeake is barred by 8 *Del. C.* § 203 from entering into any business combination with Shorewood for three years from the date of its agreement to purchase Shorewood shares from Ariel. Before the Ariel Agreement, Ariel held "sole voting power" over 5.6 million Shorewood shares beneficially owned by its clients—an amount totaling over 20% of Shorewood's outstanding shares. The Ariel Agreement provides for 4.1 million of the 5.6 million Shorewood shares controlled by Ariel—an amount equaling 14.9% of the outstanding Shorewood shares—to be sold to Chesapeake at $17.25 a share (heretofore defined as the "Purchased Shares").

The defendants, however, contend that the Agreement also provides Chesapeake with rights as to the remaining Shorewood shares held by Ariel clients (heretofore defined as the "Non–Purchased Shares")—rights that under § 203 are sufficient to make Chesapeake an owner of the Non–Purchased Shares as well and therefore the owner of over 20% of Shorewood's shares. More specifically, the defendants contend for two independent reasons that, as a result of the Agreement, Chesapeake became an "interested stockholder" under § 203.[129]

First, the defendants claim that Section 1(d)(ii) of the Agreement requires Ariel to cause its clients to execute consents in favor of Chesapeake with respect to all of the Shorewood shares beneficially owned by them, not just the Purchased Shares. Second, the defendants contend that Section 2 of the Agreement creates an economic incentive for Ariel to vote the Non–Purchased Shares with Chesapeake in circumstances where that would not be so absent the Agreement and that this incentive system also renders Chesapeake an

129. The defendants also claim that Chesapeake made a presentation to Ariel at which it persuaded Ariel that an acquisition of Shorewood was a good idea and obtained Ariel's support for such an acquisition. I have found, however, that this was not the case and that Ariel in no way viewed itself as committed to support a Chesapeake acquisition with the Non–Purchased Shares at any particular price.

owner of the Non–Purchased Shares under § 203. Before addressing these arguments, I will set forth the basic provisions of 8 *Del. C.* § 203 and how they relate to the defendants' claims.

Under § 203, an "interested stockholder" is prohibited in most circumstances from entering into any "business combination" with the corporation for a period of three years following the time that the stockholder became an "interested" one.[130] An "interested stockholder" is one who acquires "ownership" of 15% or more of the corporation's outstanding voting stock.[131]

The statute defines "ownership" expansively, with the term "owner" including any "person that individually or with or through any of its affiliates or associates: (i) [b]eneficially owns such stock, directly or indirectly; or (ii) [h]as (A) the right to acquire such stock ... or (B) the right to vote such stock pursuant to any agreement, arrangement or understanding."[132] Thus if the defendants' first argument is correct and the contract between Chesapeake and Ariel vested voting control of over 20% of Shorewood's shares in Chesapeake, then Chesapeake would be an "interested stockholder."

The defendants' second argument relies on another part of § 203's definition of an owner. That part provides that a person who has an "agreement, arrangement or understanding ... for the purpose of acquiring, holding, voting ... or disposing of such stock with any other person that beneficially owns, or whose affiliates beneficially own, directly or indirectly, such stock" is also deemed an owner of that stock.[133] By incentivizing Ariel to vote the Non–Purchased Shares with Chesapeake, the Ariel Agreement, the defendants claim, constitutes an "agreement ... or understanding" between "Chesapeake and Ariel for the purpose of ... voting" those Shares.

With that overview in mind, I turn to a resolution of the defendants' three arguments.

A. *Does The Ariel Agreement Bind Ariel To Vote The Non–Purchased Shares In Favor Of A Chesapeake Consent Solicitation?*

The defendants' first argument hinges on Section 1(d) of the Agreement, which states:

> If, prior to the Closing, [Chesapeake] or any of its affiliates ... commences a public tender offer for Shares of [Shorewood] at a cash purchase price that equals or exceeds [$17.25] per [Purchased] Share, then Ariel agrees to use its best efforts as investment adviser to exercise its discretionary authority to cause Ariel's Clients to: (i) tender the Purchased Shares in such tender offer; and (ii) execute the proxies or written consents in the form solicited by [Chesapeake] or any of its affiliates in any proxy or written consent solicitation commenced in connection with such tender offer.[134]

The defendants allege that subsection (ii) of this section applies to both the Purchased Shares and the Non–Purchased Shares and thus gives Chesapeake the contractual right to demand that Ariel vote both classes of Shares in favor of Chesapeake's solicitation offer. They point out that subsection (i) is clearly limited to the

---

130. 8 *Del. C.* § 203(a).

131. 8 *Del. C.* § 203(c)(5)(i).

132. 8 *Del. C.* § 203(c)(9)(i),(ii).

133. 8 *Del. C.* § 203(c)(9)(iii).

134. Agreement § 1(d) (JX 25).

Purchased Shares, thus supporting the inference that subsection (ii) was not so confined.[135]

I believe that the language of § 1(d)(ii) cannot be read as the defendants claim. Initially, I note that the evident purpose of § 1(d) is to govern the voting or tendering of the Purchased Shares in a situation where a vote occurs before the "Closing" of the sale of those Shares occurs. The omission of a reference to the Purchased Shares from subsection (ii) therefore seems to speak more to hurried or careless drafting than to any intent to bind Ariel to vote the Non–Purchased Shares in favor of a consent solicitation by Chesapeake. In this regard, it would make little sense for the drafter to bind Ariel to only tender the Purchased Shares into a Chesapeake tender offer when it was binding Ariel to "execute the proxies or written consents" for Chesapeake for both the Purchased and Non–Purchased Shares in any "proxy or ... consent solicitation ... in connection with such tender offer." Furthermore, because, as I next discuss, the Agreement does not otherwise address the Non–Purchased Shares at all, it is far-fetched to infer that subsection (1)(d)(ii) implicitly refers to them.

To the extent that the scope of Section 1(d) is unclear when read in isolation of other provisions of the Agreement and permits the construction the defendants advance, other provisions of the Agreement make clear that Section 1(d) cannot be interpreted as the defendants wish. For example, Section 6 of the Agreement provides:

In executing this Agreement, Ariel has acted as investment adviser for Ariel's Clients, and not with the purpose or effect of changing or influencing the control of [Shorewood], nor in connection with or as a participant in any transaction having such purpose or effect. *The parties agree that Ariel and Ariel's Clients have reserved all of their respective rights with respect to, and have no agreement, arrangement or understanding with [Chesapeake] relating to, any shares of [Shorewood] other than the Purchased Shares....*[136]

Construing the Agreement as a whole, the clear terms of Section 6 preclude a reading of § 1(d)(ii) that limits Ariel's discretion to vote the Non–Purchased Shares as it solely chooses. This construction of the Agreement is bolstered by Section 1(c), which states that if, as a result of the Agreement, Chesapeake would be deemed an "interested stockholder" under § 203, "the number of Purchased Shares automatically shall be deemed and shall be reduced to one Share less than the number of Shares that, if purchased, would cause [Chesapeake] to be deemed ... an 'interested stockholder' within the meaning of Section 203."[137] Thus the best reading of the Agreement's terms is that Section 1(d)(ii) addresses only the Purchased Shares and leaves Ariel free to vote the Non–Purchased Shares in any manner it chooses.

To the extent that the terms of the Agreement can be considered ambiguous, the extrinsic evidence of the parties' intent

---

135. The Agreement by its own terms purports to be governed by Virginia law. The parties have not quibbled over choice of law issues. The basic interpretative principles of both states are identical and follow the established practice of reading the contract in accordance with its plain language and looking at extrinsic evidence only if the contract is ambiguous.

*E.g., Douglas v. Hammett,* 28 Va.App. 517, 507 S.E.2d 98, 101 (1998); *City Investing Co. Liquidating Trust v. Continental Casualty Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993).

136. Agreement § 6 (emphasis added).

137. Agreement § 1(c).

is abundant and consistent and undercuts the defendants' argument. Representatives of Chesapeake and Ariel involved in the drafting of the Agreement both intended that the Agreement apply only to the Purchased Shares.

Therefore, nothing in Section 1(d) of the Agreement suffices to make Chesapeake an owner of the Non–Purchased Shares under § 203.

B. *Does The Agreement Create Such A Substantial Economic Incentive For Ariel To Vote Or Tender The Non–Purchased Shares In Support Of A Chesapeake Bid That The Agreement Must Be Considered One "For The Purpose" Of "Voting" The Non–Purchased Shares?*

■■■ The defendants' second argument is subtle. That argument turns on the provision of the Agreement requiring Chesapeake to pay additional consideration for the Purchased Shares if Chesapeake, a Chesapeake affiliate, or any third party not affiliated with Ariel or Chesapeake acquires ownership of a majority of Shorewood's outstanding shares pursuant to any type of transaction within one year of the closing date in the Agreement.[138] For purposes of clarity, I will call a Chesapeake or a Chesapeake affiliate-change of control transaction a "Chesapeake Majority Transaction." I will call a change of control transaction involving any other party, including Shorewood, a "Third Party Majority Transaction."

In the event of a Chesapeake Majority Transaction, Ariel would receive additional consideration for the Purchased Shares equal to the excess in the price paid by Chesapeake in such Transaction over $17.25 a share. That is, if Chesapeake paid $20 per share to consummate such a Transaction, Ariel would receive an additional $2.75 a share for the Purchased Shares.[139]

In the event of a Third Party Majority Transaction, Ariel would receive the excess, if any, of the highest per share offer Chesapeake made in any public tender offer before closing of the Third Party Majority Transaction plus 50% of the excess of the per share consideration paid in the Third Party Majority Transaction over the highest Chesapeake bid. For example, if a Third Party Majority Transaction was closed at $21 a share and Chesapeake dropped out of the bidding at $20.50 a share, Ariel would receive an additional $3.50 a share for the Purchased Shares.[140]

The defendants argue that the potential for these additional payments distorts Ariel's voting incentives with regard to the Non–Purchased Shares. In particular, the

---

138. Agreement § 2(a).

139. Agreement § 2(b).

140. *Id.* The defendants argue that the Agreement is pernicious because it enables a bidder to favor particular stockholders by offering them something more desirable ("a guaranteed $17.25 per share minimum *plus* upside protection") than what is offered to the remaining stockholders ("the conditional $17.25 per share without upside protection"). Defs. Op. Post–Trial Br. at 46. This, they fear, will revive the bad old days of coercive two-tiered tender offers, which § 203 was in large measure designed to remedy.

This argument is unpersuasive. In a Chesapeake Majority Transaction, Ariel will *never* receive more than other stockholders, and it will receive *less* than other stockholders in a Third Party Majority Transaction. The only situation where other Shorewood stockholders could be disadvantaged *vis-à-vis* Ariel is where such stockholders rely on Shorewood management's advice and don't sell (or are prevented from doing so by Shorewood's defenses), the Chesapeake bid fails, and Shorewood's stock price falls back to its pre-offer level. Any harm in that scenario would not have been caused by the Agreement.

defendants contend that in a hypothetical situation where Ariel believed the per share value of its Shorewood shares that could be *realized* in the market in some reasonable time frame under management's existing strategic plan[141] was $20.01 to $27.48 per share, the Agreement provides Ariel with an economic incentive to sell its Non–Purchased Shares (or support a consent solicitation effort to facilitate such sale) to Chesapeake or another tender offeror at any price at or above $20 per share. The reason for this is that the only way Ariel can realize additional value from its sale of the Purchased Shares is if a Chesapeake or Third Party Majority Transaction comes to pass. Thus, the fact that Ariel could get, for example, $25 per Non–Purchased Share in six months under management's plan would not override the economic incentives offered by a Chesapeake Majority Transaction at $20. Under the former alternative, Ariel's total blended return for the Purchased and Non–Purchased Shares is $108 million. Under the latter alternative, Ariel's total blended return is $112 million—because under the Agreement the $17.25 Ariel received for the Purchased Shares would increase to $20. The incentives could also lead Ariel to support a Third Party Majority Transaction in a similar circumstance where that would trigger additional compensation for the Purchased Shares.

The defendants argue that this incentive structure is sufficient to make Chesapeake a person that has "any agreement, arrangement or understanding for the purpose of ... voting [the Non–Purchased Shares]." As such, § 203(c)(9)(iii), they contend, renders Chesapeake an "owner" of the Non–Purchased Shares and therefore an interested stockholder.

█ Given the broad language of the statute,[142] it is plausible that an agreement could create such substantial economic incentives for the seller with respect to purchased shares that the agreement could also, as a practical matter, constitute an "agreement, arrangement or understanding for the purpose of ... voting" other shares still held by the seller. But for that to be the case, there should be persuasive evidence showing that the agreement essentially renders it economically irrational for the seller to, *in almost all likely circumstances,* do anything other than vote his remaining shares in lockstep with the buyer.

The Agreement between Chesapeake and Ariel does not approach this level of incentivization. First of all, one cannot address the defendants' argument without addressing one of its foundational problems: their own expert admits that Ariel would not have sold the Purchased Shares at $17.25 if it believed that Shorewood's existing plans would, without an extraordinary transaction, deliver a realizable value in excess of that amount in the next six months to a year.[143] It would have been stupid for Ariel to sell over 70% of its position at $17.25 with the hope of an upside in the event of a Chesapeake or Third Party Majority Transaction at, for example, $18 to $20 a share, if it believed that the marketplace would deliver the potential to sell at, for example, $22 in six

141. Or a non-Majority Transaction proposed by Chesapeake at such value level, such as a partial repurchase or special dividend.

142. *Siegman v. Columbia Pictures Entertainment, Inc. ("Siegman II"),* C.A. No. 11152, mem. op. at 13, Hartnett, V.C., 1993 WL 10969 (Jan. 12, 1993) (indicating that the words "any agreement, arrangement or un-

derstanding" are "very broad"); *Siegman v. Columbia Pictures Entertainment, Inc. ("Siegman I"),* 576 A.2d 625, 631–32 (1989) (referring repeatedly to the "broad" language of the statute).

143. Tr. 852–53.

months without such a Majority Transaction.

Furthermore, in a bidding contest between Chesapeake and another potential acquiror, the Agreement never incentivizes Ariel to prefer a lower Chesapeake bid over a higher bid from the other acquiror. Rather, it is always economically rational for Ariel to support the highest bidder.

Similarly, if Shorewood itself proposes a Third Party Majority Transaction (e.g., a management buy-out) involving the purchase by Shorewood of a majority of its outstanding shares, Ariel will prefer the Shorewood self-tender over Chesapeake in any situation where Shorewood offered the higher price.

Indeed, in the situation now faced by Ariel, the Chesapeake Consent Solicitation in support of the $17.25 Tender Offer, Ariel's voting incentives as to the Non-Purchased Shares are totally unaffected by the Agreement. Ariel's vote will be solely determined by whether it believed it should put in place a Shorewood board that would enable Ariel to sell the Non-Purchased Shares in the $17.25 Tender Offer.

As a result, it is only in a very unlikely scenario that the incentive effects of the Agreement will influence its vote. That scenario involves a situation where Ariel: (i) has a change of heart; (ii) comes to believe that it was wrong to sell the Purchased Shares at $17.25 in the first instance because management was correct about the value of the company under current plans; and (iii) subjectively concludes that management's existing plans

will maximize the value of Shorewood in a realizable way (e.g., at $25 a share) in the relative near term; but (iv) must vote the Non-Purchased Shares for a Chesapeake or Third Party Majority Transaction at $20 a share [144] to maximize its total return from both the Purchased and Non-Purchased Shares. The premise of these assumptions is that Ariel, who was Shorewood's largest stockholder, a long-time investor in Shorewood, and a professional investing firm, drastically changes its view about whether a status quo strategy will optimize the realizable value of its shares. Clearly, it did not believe that to be the case when it freely sold its shares to Chesapeake in late November 1999. And even in this rather unlikely scenario, Ariel has no contractual duty to vote a particular way as a result of the Agreement; it simply has an incentive to do so.[145]

Even the broad language of § 203(c)(9)(iii) is not so sweeping as to transform the economic incentives in the Agreement into an understanding or arrangement about the voting of the Non-Purchased Shares. In the most likely scenarios, Ariel will vote the Non-Purchased Shares free of any influence by the Agreement. And in no case will it ever have an incentive to prefer a lower Chesapeake bid over a more lucrative Third Party Majority Transaction—including one proposed by Shorewood itself. Coupled with the not insignificant reality that Ariel has the legal authority to vote the Non-Purchased Shares in any manner it so chooses, these facts undercut the defendants' claim that Chesapeake and Ariel have an understand-

144. If $17.25 were used in this scenario, the defendants admit that Ariel would have a free choice.

145. Ariel does not expect a scenario where management's plan delivers realizable value above $20 will come to pass in the relevant future. Rather, it believes that if Chesa-

peake's offer fails and no other bidder emerges, Shorewood's stock price will fall to pre-Tender Offer levels. In that scenario, Ariel will, it says, take its $17.25 profit on the Purchased Shares and may reinvest some of it in lower priced Shorewood shares. Morton Dep. at 125–27.

ing "for the purpose of" voting the non-Purchased Shares.[146]

Furthermore, the adoption of the defendants' argument would be disrespectful of the statute's language, which requires the existence of an "agreement," "arrangement," or "understanding" between Ariel and Chesapeake "for the purpose of voting" the Non–Purchased Shares. While these words permit a fairly high degree of informality in the form in which parties come together,[147] each of the words presupposes a meeting of the minds.[148] As noted, I concede that there might be a level of economic incentivization as to sold shares that could be so strong as to make clear that the contracting parties had in effect "agreed," "arranged," or "understood" that the seller's remaining shares would be voted as the buyer wished. That is, the economic structure would render the seller's legal right to vote its remaining shares a pretext and support the inference that the parties had in fact agreed, arranged, or reached an understanding to vote all of their shares together.

In this case, Ariel has far too many "free" voting options to permit such an inference. Moreover, Ariel has made clear its view that it has no obligation to or understanding with Chesapeake about how it will vote the Non–Purchased Shares. Ariel insists that it will vote those shares in the best interests of its clients. In most conceivable circumstances, the Agreement will have no influence on its calculus.

Finally, I am reluctant to engage in the implicit policy-making exercise that is, in my view, necessary to adopt the defendants' argument. Section 203 was intended "to strike a balance between the benefits of an unfettered market for corporate shares and the well-documented and judicially recognized need to limit abusive takeover tactics."[149] The defendants would prevent stockholders from selling some of their stock to a potential acquiror, while preserving the right to benefit from a subsequent, higher offer from *any* party. The defendants produced no evidence that such transactions are not relatively commonplace. Even more important, they failed to submit convincing evidence that such deals increase the potential for "abusive takeovers."

Because § 203 has the practical effect of disenfranchising parties found to be "interested" under its terms, this court should be hesitant to strain the statute's language to cover situations that do not threaten the interests the statute was designed to protect. Seeing no such threat here, I decline to extend § 203's reach.

## C. *Even If The Agreement Violates § 203, The Remedy Is Reformation Per The Agreement's Terms*

To the extent I am incorrect, Chesapeake would still not be deemed an "interested stockholder" under § 203. Rather, by the Agreement's terms, the Purchased Shares would be reduced to the number

---

**146.** The defendants slight this factor, citing "efficient breach" scenarios. But, thankfully, there remain a large number of people who live up to contractual obligations as a matter of honor and integrity, even if they could reap greater rewards by breaking their promises. I thus give weight to Ariel's freedom from any contractual obligation to vote the Non–Purchased Shares with Chesapeake.

**147.** *Siegman I*, 576 A.2d at 631–32; *Siegman II*, mem. op. at 13.

**148.** As to "agreement" and "understanding" see, e.g., BLACK'S LAW DICTIONARY 67–68, 1527 (7th ed.1999). As to "arrangement," see, e.g., WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 104 (1984).

**149.** H.B. 396, 134th General Assembly 9 (1987).

sufficient to satisfy § 203.[150] Based on the economic evidence the defendants presented, this would be well short of 4.1 million shares unless any economic incentive, however slight, as to the Non–Purchased Shares is sufficient to satisfy § 203. At best the defendants could—after further proof—obtain an order requiring Chesapeake to purchase *none* of the Purchased Shares. In no event, therefore, would § 203 bar Chesapeake from proceeding with its Consent Solicitation.

### VIII. *Conclusion*

For the foregoing reasons, a partial final judgment shall be entered in Chesapeake's favor on its claim that the Supermajority Bylaw should be enjoined and dismissing the defendants' counterclaims based on 8 *Del. C.* §§ 141 and 203. Chesapeake shall, upon approval as to form, submit a conforming order.[151]

**150.** Agreement § 1(c); 8 *Del. C.* § 203(b)(4).

**151.** The defendants have not contested Chesapeake's entitlement to injunctive relief other than on the merits, in essence conceding that irreparable harm exists and that no balancing of the harms could save the Bylaw if they failed to prevail on the merits.